# EXHIBIT "A"

**CT** CORPORATION
A WoltersKluwer Company

**Service of Process
Transmittal**
05/18/2006
Log Number 511169918

**TO:**   Allen P Waxman
Pfizer Inc.
M.S. 150/02/14, 235 East 42nd Street
New York, NY, 10017-5755

**RE:**   **Process Served in Alabama**

**FOR:**   Pfizer Inc. (Domestic State: DE)

**ENCLOSED ARE COPIES OF LEGAL PROCESS RECEIVED BY THE STATUTORY AGENT OF THE ABOVE COMPANY AS FOLLOWS:**

| | |
|---|---|
| **TITLE OF ACTION:** | Alabama Associated General Contractors, Inc., et al. Pltfs. vs. Pfizer, Inc., et al. Dfts. |
| **DOCUMENT(S) SERVED:** | Summons, Complaint |
| **COURT/AGENCY:** | Montgomery County Circuit Court, AL<br>Case # CV 06 1252 |
| **NATURE OF ACTION:** | Intellectual Property Litigation - Trade Secret infringement - Off label marketing scheme |
| **ON WHOM PROCESS WAS SERVED:** | The Corporation Company, Montgomery, AL |
| **DATE AND HOUR OF SERVICE:** | By Certified Mail on 05/18/2006 postmarked on 05/04/2006 |
| **APPEARANCE OR ANSWER DUE:** | 30 days |
| **ATTORNEY(S) / SENDER(S):** | Steven A. Martino<br>PO Box 894<br>Mobile, AL, 36601 |
| **ACTION ITEMS:** | SOP Papers with Transmittal, via  Fed Ex 2 Day, 790435236628 |
| **SIGNED:**<br>**ADDRESS:** | The Corporation Company<br>2000 Interstate Park Drive<br>Suite 204<br>Montgomery, AL, 36109 |
| **TELEPHONE:** | 334-387-7680 |



Page 1 of 1 / CT

Information displayed on this transmittal is for CT Corporation's record keeping purposes only and is provided to the recipient for quick reference. This information does not constitute a legal opinion as to the nature of action, the amount of damages, the answer date, or any information contained in the documents themselves. Recipient is responsible for interpreting said documents and for taking appropriate action. Signatures on certified mail receipts confirm receipt of the package only, not of its contents.



UNITED STATES POSTAL SERVICE MONTGOMERY AL 361

18 MAY 2006 PM 1

First-Class Mail
Postage & Fees Paid
USPS
Permit No. G-10

• Sender: Please print your name, address, and ZIP+4 in this box •

Montgomery County Circuit
Clerk's Office
Post Office Box 1667
Montgomery, AL 36102-1667

667    B014

**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

The Corporation Company
2000 Interstate Park Drive
Suite 204
Montgomery, AL 36109

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature

X

☐ Agent
☐ Addressee

B. Received by ( Printed Name)     C. Date of Delivery

D. Is delivery address different from item 1?   ☐ Yes
   If YES, enter delivery address below:        ☐ No

S&C DI

Cv- 06- 1252

3. Service Type
   ☑ Certified Mail    ☐ Express Mail
   ☐ Registered        ☑ Return Receipt for Merchandise
   ☐ Insured Mail      ☐ C.O.D.

4. Restricted Delivery? (Extra Fee)            ☐ Yes

2. Article Number
   (Transfer from service label)     7004 2890 0002 8273 1610

PS Form 3811, February 2004        Domestic Return Receipt        102595-02-M-1540

Melissa Rittenour
Circuit...
Filed
MAY 2006

| State of Alabama<br>Unified Judicial System<br><br>Form ARCivP-93    Rev. 5/99 | **COVER SHEET**<br>**CIRCUIT COURT - CIVIL CASE**<br>(Not For Domestic Relations Cases) | Case Number    CV-06-1252<br>**C V**<br>Date of Filing:                    Judge Code:<br>Month    Day    Year    JH |
| --- | --- | --- |

### GENERAL INFORMATION

IN THE CIRCUIT COURT OF   Montgomery County                                          , **ALABAMA**

*(Name of County)*

Alabama Associated General Contractors, Inc., et al.   v.   Pfizer, Inc., et al.

**Plaintiff**                                                     **Defendant**

**First Plaintiff**  ☐ Business  ☑ Individual       **First Defendant**  ☑ Business  ☐ Individual
                     ☐ Government  ☐ Other                              ☐ Government  ☐ Other

---

**NATURE OF SUIT:**   Select primary cause of action, by checking box *(check only one)* that best characterizes your action:

**TORTS: PERSONAL INJURY**

☐ WDEA - Wrongful Death
☐ TONG - Negligence: General
☐ TOMV - Negligence: Motor Vehicle
☐ TOWA - Wantonness
☐ TOPL - Product Liability/AEMLD
☐ TOMM - Malpractice-Medical
☐ TOLM - Malpractice-Legal
☐ TOOM - Malpractice-Other
☑ TBFM - Fraud/Bad Faith/Misrepresentation
☐ TOXX - Other: _____

**TORTS: PROPERTY INJURY**

☐ TOPE - Personal Property
☐ TORE - Real Property

**OTHER CIVIL FILINGS**

☐ ABAN - Abandoned Automobile
☐ ACCT - Account & Nonmortgage
☐ APAA - Administrative Agency Appeal
☐ ADPA - Administrative Procedure Act
☐ ANPS - Adults in Need of Protective Services

**OTHER CIVIL FILINGS (cont'd)**

☐ MSXX - Birth/Death Certificate Modification/Bond Forfeiture Appeal/<br>Enforcement of Agency Subpoena/Petition to Preserve
☐ CVRT - Civil Rights
☐ COND - Condemnation/Eminent Domain/Right-of-Way
☐ CTMP - Contempt of Court
☐ CONT - Contract/Ejectment/Writ of Seizure
☐ TOCN - Conversion
☐ EQND - Equity Non-Damages Actions/Declaratory Judgment/Injunction<br>Election Contest/Quiet Title/Sale For Division
☐ CVUD - Eviction Appeal/Unlawful Detainer
☐ FORJ - Foreign Judgment
☐ FORF - Fruits of Crime Forfeiture
☐ MSHC - Habeas Corpus/Extraordinary Writ/Mandamus/Prohibition
☐ PFAB - Protection From Abuse
☐ FELA - Railroad/Seaman (FELA)
☐ RPRO - Real Property
☐ WTEG - Will/Trust/Estate/Guardianship/Conservatorship
☐ COMP - Workers' Compensation
☐ CVXX - Miscellaneous Circuit Civil Case

---

**ORIGIN** *(check one):*   F ☑ INITIAL FILING       A ☐ APPEAL FROM            C ☐ OTHER: _____
                                                       DISTRICT COURT
                           R ☐ REMANDED              T ☐ TRANSFERRED FROM
                                                       OTHER CIRCUIT COURT

---

**HAS JURY TRIAL BEEN DEMANDED?**   ☑ YES  ☐ NO       Note:  Checking "Yes" does not constitute a demand for a<br>jury trial. (See Rules 38 and 39, Ala.R.Civ.P, for procedure)

---

**RELIEF REQUESTED:**   ☑ MONETARY AWARD REQUESTED       ☐ NO MONETARY AWARD REQUESTED

**ATTORNEY CODE:**
MAR057        5/4/06                    _____
              Date                      Signature of Attorney/Party filing this form

---

**MEDIATION REQUESTED:**   ☐ YES  ☑ NO  ☐ UNDECIDED

State of Alabama          SUMMONS - CIVIL          Case Number

Unified Judicial System                            CV-06- 1252

## IN THE CIRCUIT COURT OF MONTGOMERY COUNTY, ALABAMA

ALABAMA ASSOCIATED GENERAL          PFIZER, INC., et al.,
CONTRACTORS, INC., et al.

    Plaintiffs,                      Defendants

NOTICE TO REGISTERED AGENT OF PFIZER, INC.:
       The Corporation Company
       2000 Interstate Park Drive
       Suite 204
       Montgomery, AL 36109

    The Complaint which is attached to this summons is important and you
must take immediate action to protect your rights. You or your attorney are
required to mail or hand deliver a copy of a written Answer, either
admitting or denying each allegation in the Complaint to STEVEN A. MARTINO,
Attorney for Plaintiffs, whose address is Post Office Box 894, Mobile,
Alabama 36601. THIS ANSWER MUST BE MAILED OR DELIVERED WITHIN THIRTY (30)
DAYS AFTER THIS SUMMONS AND COMPLAINT WERE DELIVERED TO YOU OR A JUDGMENT
BY DEFAULT MAY BE ENTERED AGAINST YOU FOR THE MONEY OR OTHER THINGS DEMANDED
IN THE COMPLAINT. YOU MUST ALSO FILE THE ORIGINAL OF YOUR ANSWER WITH THE
CLERK OF THIS COURT.

    TO ANY SHERIFF OR ANY PERSON AUTHORIZED by either Rule 4.1(b)(2) or
4.2(b)(2) or 4.4(b)(2) of the Alabama Rules of Civil Procedure: You
are hereby commanded to serve this summons and a copy of the complaint
in this action upon Defendant.

  X  This service by certified mail of this summons is initiated upon
written request of the Plaintiff pursuant to Rule 4.1© of the Alabama
Rules of Civil Procedure.

05/16 ,2006                              By: _____
Date          Clerk/Register

RETURN ON
_____ Certified

             office on (Date)

_____ I certify
Complaint
County, Al

_____
Date

Address of Serv

**U.S. Postal Service**
**CERTIFIED MAIL RECEIPT**
(Domestic Mail Only; No Insurance Coverage Provided)
For delivery information visit our website at www.usps.com

**OFFICIAL USE**

| | |
|---|---|
| Postage | $ |
| Certified Fee | |
| Return Receipt Fee (Endorsement Required) | |
| Restricted Delivery Fee (Endorsement Required) | |
| Total Postage & Fees | $ |

Postmark Here

Sent To: The Corporation Company
Street 2000 Interstate Park Drive
or P. Suite 204
City: Montgomery, AL 36109

PS F                                    Instructions

State of Alabama      SUMMONS - CIVIL      Case Number

Unified Judicial System                      CV-06- 1252

## IN THE CIRCUIT COURT OF MONTGOMERY COUNTY, ALABAMA

ALABAMA ASSOCIATED GENERAL          PFIZER, INC., et al.,
CONTRACTORS, INC., et al.

     Plaintiffs,                        Defendants

NOTICE TO: David Reynolds Longmire, M.D.
                 13150 Highway 43
                 Russellville, AL 35653     D82

     The Complaint which is attached to this summons is important and you must take immediate action to protect your rights. You or your attorney are required to mail or hand deliver a copy of a written Answer, either admitting or denying each allegation in the Complaint to STEVEN A. MARTINO, Attorney for Plaintiffs, whose address is Post Office Box 894, Mobile, Alabama 36601. THIS ANSWER MUST BE MAILED OR DELIVERED WITHIN THIRTY (30) DAYS AFTER THIS SUMMONS AND COMPLAINT WERE DELIVERED TO YOU OR A JUDGMENT BY DEFAULT MAY BE ENTERED AGAINST YOU FOR THE MONEY OR OTHER THINGS DEMANDED IN THE COMPLAINT. YOU MUST ALSO FILE THE ORIGINAL OF YOUR ANSWER WITH THE CLERK OF THIS COURT.

__X__ TO ANY SHERIFF OR ANY PERSON AUTHORIZED by either Rule 4.1(b)(2) or 4.2(b)(2) or 4.4(b)(2) of the Alabama Rules of Civil Procedure: You are hereby commanded to serve this summons and a copy of the complaint in this action upon Defendant.

__ This service by certified mail of this summons is initiated upon written request of the Plaintiff pursuant to Rule 4.1© of the Alabama Rules of Civil Procedure.

__05/16/06__,2006    _Melissa Rittenaur_   By: __kh__
Date                 Clerk/Register

RETURN ON SERVICE:

__ Certified Mail return receipt received in this office on (Date) _____. (Return receipt attached hereto).

__ I certify that I personally delivered a copy of the Summons and Complaint to_____ in _____ County, Alabama, on (Date) _____.

_____, 2006        _____
Date                     Server Signature

Address of Server_____
_____        _____
_____        Type of Process Server

2006 MAY 25 PM 2:44 FILED IN CIRCUIT COURT OF MONTGOMERY COUNTY

## IN THE CIRCUIT COURT OF MONTGOMERY COUNTY, ALABAMA

ALABAMA ASSOCIATED GENERAL   *
CONTRACTORS, INC.; AUTOMOTIVE *
AFTERMARKET FUND;   *
WORKERSFIRST COMPFUND; THE   *
ALABAMA SELF-INSURED   *
WORKER'S COMPENSATION FUND; *
THE HEALTHCARE WORKERS   *
COMPENSATION SELF-INSURANCE *
FUND; THE ALABAMA   *
WORKERS' COMPENSATION   *
SELF-INSURANCE FUND; ALABAMA *
TRUCKING ASSOCIATION   *
WORKER'S COMPENSATION SELF- *
INSURANCE FUND; and   *
ASSOCIATION OF COUNTY   *
COMMISSIONS SELF-INSURANCE *
FUND,   *
  *
      Plaintiffs,   *
  *
vs.   *   Civil Action No. _Cv-06-1252__
  *
PFIZER, INC., successor in interest to   *
WARREN-LAMBERT COMPANY;   *
DAVID REYNOLDS LONGMIRE;   *
jointly and individually,   *
  *
      Defendants.   *

## COMPLAINT

Plaintiffs, the Alabama Associated General Contractors, Inc. the Automotive

Aftermarket Fund, the WorkersFirst Compfund, the Alabama Self-Insured Worker's

Compensation Fund, the Healthcare Workers' Compensation Self-Insurance Fund, and the

Alabama Workers' Compensation Self-Insurance Fund, Alabama Trucking Association

Worker's Compensation Self-Insurance Fund, and Association of County Commissions

Self-Insurance Fund, allege as follows against Defendants Pfizer, Inc., successor in

interest to Warner-Lambert Company ("Pfizer")[1], and David Reynolds Longmire, jointly and individually:

## INTRODUCTION

1.      This action is brought as a result of Pfizer's unlawful marketing scheme designed to push and promote "off-label" uses of the prescription drug Neurontin. "Off-label" is the term describing uses for a drug that are not approved by the U.S. Food and Drug Administration ("FDA"). The scientific name for Neurontin is gabapentin.

2.      Pfizer's scheme involves a deceitful marketing campaign. Pfizer, like other drug companies, spends millions of dollars each year trying to persuade doctors to prescribe their particular drugs. There are strict FDA regulations about what form that promotion can take, however. These requirements and rules are meant to ensure that drug companies give physicians and medical personnel trustworthy information, so that medications are prescribed appropriately.

3.      In 1993, Pfizer received FDA approval to market and sell Neurontin for the treatment of epilepsy in certain doses. Starting as early as 1995, however, Pfizer embarked on a course of conduct the purpose of which was to increase Neurontin sales for diseases and ailments with respect to which Neurontin had not received FDA approval, *i.e.,* off-label. Pfizer's sales department recognized a significant profit potential in the off-label promotion of Neurontin for other purposes and at higher dosages. Consequently, Pfizer decided to completely avoid the normal regulatory process of the FDA pertaining to

---

[1] As used herein, unless otherwise stated the term "Pfizer" collectively means Pfizer, Inc.; Warner-Lambert Company; and Parke-Davis, a division of Warner-Lambert Company.

the marketing of a new use of a drug and to proceed in an illegal fashion. The decision was also made to actively conceal the illegal means which would be used to market the drug.

4.      Pfizer's scheme was implemented so Pfizer could tap into the enormous market for off-label uses in the United States. Ultimately, Pfizer's actions proved successful as annual profits from Neurontin sales between 1995 to 2003 rose from $97.5 million to approximately $2.7 billion, due mostly to off-label uses. Approximately 90% of all Neurontin prescriptions were, and are currently, written for off-label purposes.

5.      Pfizer's scheme, described in more detail below, ultimately duped physicians, consumers, and third-party payors into believing that prescribing and taking Neurontin for the off-label uses that Pfizer promoted were appropriate even though Pfizer knew FDA approval had not been granted and, moreover, knew there was no legitimate scientific evidence suggesting Neurontin was safe and effective when so used.

6.      The United States Attorney for the District of Massachusetts ultimately brought criminal charges against Pfizer for this conduct. On May 13, 2004, Pfizer agreed to plead guilty to these federal criminal charges.

## PARTIES AND VENUE

7.      Plaintiff, Alabama Associated General Contractors, Inc., is a self-insured member of a non-incorporated pooling agreement among employers instituted pursuant to Ala. Code 1975 § 25-5-9 in which employers pool their worker's compensation liabilities. Plaintiff pays for medical costs incurred by its members, including the costs of prescription medications. Plaintiff's principal place of business is in Irondale, Alabama. Plaintiff has paid substantial monies for Neurontin prescribed for off-label uses.

8.      Plaintiff, the Automotive Aftermarket Fund, is a self-insured member of a non-

3

incorporated pooling agreement among employers instituted pursuant to Ala. Code 1975 § 25-5-9 in which employers pool their worker's compensation liabilities. Plaintiff pays for medical costs incurred by its members, including the costs of prescription medications. Plaintiff's principal place of business is in Montgomery, Alabama.  Plaintiff has paid substantial monies for Neurontin prescribed for off-label uses.

9.      Plaintiff, the WorkersFirst Compfund, is a self-insured member of a non-incorporated pooling agreement among employers instituted pursuant to Ala. Code 1975 § 25-5-9 in which employers pool their worker's compensation liabilities. Plaintiff pays for medical costs incurred by its members, including the costs of prescription medications. Plaintiff's principal place of business is in Birmingham, Alabama. Alabama. Plaintiff has paid substantial monies for Neurontin prescribed for off-label uses.

10.      Plaintiff, the Alabama Self-Insured Worker's Compensation Fund, is a self-insured member of a non-incorporated pooling agreement among employers instituted pursuant to Ala. Code 1975 § 25-5-9 in which employers pool their worker's compensation liabilities. Plaintiff pays for medical costs incurred by its members, including the costs of prescription medications. Plaintiff's principal place of business is in Birmingham, Alabama. Alabama. Plaintiff has paid substantial monies for Neurontin prescribed for off-label uses.

11.      Plaintiff, the Healthcare Workers' Compensation Self-Insurance Fund, is a self-insured member of a non-incorporated pooling agreement among employers instituted pursuant to Ala. Code 1975 § 25-5-9 in which employers pool their worker's compensation liabilities. Plaintiff pays for medical costs incurred by its members, including the costs of prescription medications. Plaintiff's principal place of business is in Montgomery, Alabama. Alabama. Plaintiff has paid substantial monies for Neurontin prescribed for off-label uses.

4

12.    Plaintiff, the Alabama Workers' Compensation Self-Insurance Fund, is a self-insured member of a non-incorporated pooling agreement among employers instituted pursuant to Ala. Code 1975 § 25-5-9 in which employers pool their worker's compensation liabilities. Plaintiff pays for medical costs incurred by its members, including the costs of prescription medications. Plaintiff's principal place of business is in Montgomery, Alabama. Alabama. Plaintiff has paid substantial monies for Neurontin prescribed for off-label uses.

13.    Plaintiff, the Alabama Trucking Association Worker's Compensation Self-Insurance Fund, is a self-insured member of a non-incorporated pooling agreement among employers instituted pursuant to Ala. Code 1975 § 25-5-9 in which employers pool their worker's compensation liabilities. Plaintiff pays for medical costs incurred by its members, including the costs of prescription medications. Plaintiff's principal place of business is in Montgomery, Alabama. Plaintiff has paid substantial monies for Neurontin prescribed for off-label uses.

14.    Plaintiff, the Association of County Commissions Self-Insurance Fund, is a self-insured member of a non-incorporated pooling agreement among employers instituted pursuant to Ala. Code 1975 § 25-5-9 in which employers pool their worker's compensation liabilities. Plaintiff pays for medical costs incurred by its members, including the costs of prescription medications. Plaintiff's principal place of business is in Montgomery, Alabama. Plaintiff has paid substantial monies for Neurontin prescribed for off-label uses.

15.    Defendant Pfizer, Inc. is a Delaware corporation maintaining its principal place of business in the State of New York. In June of 2000, Pfizer, Inc. merged with Warner-Lambert Company and created the present-day company. Prior to that date, Warner-Lambert Company manufactured, marketed and sold the drug Neurontin through

5

its Parke-Davis division. Since that date, Pfizer, Inc., has manufactured, marketed and sold Neurontin. Pfizer, Inc., is liable for Warner-Lambert Company's tortious conduct in the marketing and sale of Neurontin prior to June 2000, pursuant to principles of corporate-successor liability applicable to mergers; because Pfizer, Inc., expressly agreed to assume the obligations of Warner-Lambert Company; and because Pfizer, Inc., is a mere continuation of Warner-Lambert Company.

16.    Defendant David Reynolds Longmire ("Longmire") is an individual and a resident citizen of the State of Alabama. Longmire is a physician who participated in Pfizer's unlawful marketing scheme as hereinafter set out.

17.    Venue is proper in Montgomery County pursuant to Ala. Code 1975 § 6-3-7(a) and pursuant to Rule 82(c) of the Alabama Rules of Civil Procedure, because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred there; and because it is the county in which one or more of Plaintiffs maintained their principal office at the time of the accrual of the causes of action set out herein, and Pfizer does business by agent in said county.

18.    Plaintiffs bring this action based solely upon the common law and statutory law of the State of Alabama. Plaintiffs' claims herein are not based upon any federal constitutional provision, federal statute, federal law, or federal regulation, and Plaintiffs do not seek relief in this Complaint under any federal constitutional provision, statute, law, or regulation. Plaintiffs' expressly and irrevocably waive and disavow any claim and any relief arising under any federal constitutional provision, statute, law, or regulation, whether the same is pled in this Complaint or not. If it is determined that any one or more of Plaintiffs' claims arise under any federal constitutional provision, statute, law, or regulation, then

6

Plaintiffs simply have no cause of action and no remedy with respect to such claim or claims, because Plaintiffs have permanently and irrevocably waived any federal claims and remedies with respect to the matters set out in this Complaint. Plaintiffs have elected to bring their claims based solely upon Alabama state law.

## FACTUAL ALLEGATIONS

### A.    FDA Regulations

19.    FDA regulations require any pharmaceutical company to seek and obtain FDA approval before any new drug may be marketed. Once approval is granted, a drug may only be promoted for the approved use at the approved dosage.

20.    Physicians may still prescribe drugs for unapproved uses. These uses are deemed "off-label" because they have not been approved by the FDA. A pharmaceutical company is permitted to disseminate certain information about off-label uses, but such dissemination must adhere to strict requirements. For instance, the manufacturer must submit an application to the FDA seeking approval of the drug for off-label use; the manufacturer must provide its marketing materials to the FDA prior to dissemination; the materials must be in unabridged form; and the manufacturer must include disclosures that the materials pertain to an unapproved use of the drug, and, if the FDA deems it appropriate, "additional objective and scientifically sound information . . . necessary to provide objectivity and balance." Food and Drug Administration Act of 1997, 21 U.S.C. § 360aaa, *et seq.* The dissemination of information in violation of these provisions violates the Food, Drug and Cosmetic Act. 21 U.S.C. § 331(z).

21.    Although these requirements permit pharmaceutical companies to disseminate to physicians and other health care practitioners qualified forms of written

7

information concerning the safety, effectiveness, or benefit of a use not described in the approved labeling of a drug, 21 U.S.C. § 360aaa(a), manufacturers are permitted to provide only authorized information in the form of unabridged peer-reviewed articles or qualified reference publications. *Id.* § 360aaa-1. This law also requires pharmaceutical companies to furnish federal regulators with advance copies of the information they disseminate. 21 U.S.C. §360aaa. Any deviation from these requirements violates FDA regulations.

**B.     Neurontin And The Off-Label Marketing Scheme**

22.     In December 1993, the FDA approved Neurontin as "adjunctive therapy" for the treatment of certain types of seizures in adult patients suffering from epilepsy. "Adjunctive therapy" means that the drug could not be prescribed by itself for the treatment of epilepsy, but as an add-on drug in the event that a primary anti-epilepsy drug was not successful. The FDA approved labeling stated that Neurontin is only effective at dosages ranging from 900 to 1800 mg/day.[2]

23.     Pfizer's original patent on Neurontin was set to expire in December 1998. This meant that Pfizer had exclusive rights to the drug for a mere 5 years. After the expiration of the Neurontin patent Pfizer would be forced to share the market for Neurontin with generic drug manufacturers. This would substantially reduce Pfizer's profits and its ability to keep Neurontin's retail price high.

24.     At the time Pfizer filed its New Drug Application ("NDA") with the FDA, Pfizer intended Neurontin to be used for other indications besides epilepsy adjunctive therapy.

_____

[2] In May of 2002, the FDA also approved Neurontin for management of postherpetic neuralgia, pain resulting from nerve damage caused by shingles.

8

In the early to mid 1990's, Pfizer filed patent applications for Neurontin claiming it to be effective in the treatment of depression, neurogenerative disease, mania, bipolar disease and for anxiety and panic.

25.    Pfizer never sought FDA approval, however, for the use of Neurontin to treat the conditions described in the patent applications.

26.    Pfizer's sole purpose was profits.  The market for the off-label uses of Neurontin such as pain management, psychiatric disorders, anxiety and depression, were much larger than the market for epilepsy alone.

27.    Early on, Pfizer intended to file supplemental NDAs in order to expand Neurontin's approved indications, including applications for monotherapy[3] and for various psychiatric and neurological indications. However, by 1995 Pfizer came to the conclusion it would be uneconomical to assume the expense necessary to conduct clinical trials necessary to prove that Neurontin was safe and effective for these uses. Assuming Neurontin could be proved to be safe and effective, the 1998 expiration of the Neurontin patent meant that generic manufacturers of Neurontin would reap much of the reward that comes with proving Neurontin could be safely used for other indications.

28.    After performing extensive economic analysis, senior officials for Pfizer determined that it was not sufficiently profitable for Pfizer to obtain FDA approval for Neurontin's alternative uses. Instead, Pfizer's officials developed a strategy that would allow Pfizer to avoid the costs of proving that Neurontin was safe and effective for these other uses, while allowing Pfizer to compete in the lucrative off-label markets. As one

---

[3] "Monotherapy" means that the drug can be prescribed by itself for the treatment of epilepsy.

9

aspect of the scheme, Pfizer decided to employ a "publication strategy" that would allow it to promote Neurontin by the massive distribution of publications supposedly written by independent researchers that purportedly described the scientific evaluation of Neurontin. A clear advantage of this strategy, from Pfizer's perspective, was that it could be employed immediately - there would be no need to wait for the results of scientifically conducted clinical trials to determine if Neurontin was actually effective in the treatment of these conditions.

29.    As set forth above, federal regulations did not permit Pfizer to promote unapproved uses of Neurontin. Pfizer was allowed, however, to distribute publications created by independent "third parties" that described results of off-label uses of Neurontin as long as these materials were given in response to unsolicited requests from physicians. Pfizer exploited this narrow exception by creating events and programs that would allow their employees and independent contractors to promote off-label uses under circumstances that would allow Pfizer the chance to deny, wrongfully, that they had actually promoted and solicited off-label usage.

30.    Marketing executives at Parke-Davis headquarters in Morris Plains, New Jersey and in its five regional customer business units ("CBUs") selected a marketing strategy which would deliberately lead to increased off-label usage of Neurontin even though Pfizer knew that they could not promote Neurontin lawfully for non-approved uses. These executives knew that Pfizer was not supposed to create or design the contents of the communications that would be distributed pursuant to the "publication strategy" or do anything to generate the practicing physicians' interest in receiving such communications. As demonstrated below, Pfizer ignored these legal requirements and, instead, put into

10

effect a pervasive pattern of illegal conduct, lasting from at least 1994 through 1998, and, on information and belief, through May of 2004.

31.     Significant ingenuity and resourcefulness was necessary in order to execute this unlawful scheme without detection. Faced with the fact that their "publication strategy" required publications from independent physicians when no such publications existed, Pfizer hired non-physician technical writers to create articles for medical journals and then paid actual specialists to be the articles' "authors." Faced with the fact that their normal marketing force could not deliver the off-label message, Pfizer trained "medical liaisons," technical employees who were supposed to provide balanced scientific information to doctors, to promote off-label uses of Neurontin. And, faced with the fact that in order for a publication strategy to actually increase usage of a drug, Pfizer had to have a large group of doctors interested in experimenting on patients, and an even larger group of doctors who were interested in receiving information about those experiments, Pfizer generated both groups by liberally distributing payments to both groups of physicians through "consultants" meetings, speakers bureaus, medical education seminars, grants, "studies," advisory boards and teleconferences.

32.     Pfizer carried out this scheme through the following, among other means:

- illegal kickbacks to physicians who prescribed large amounts of Neurontin for off-label purposes to patients;

- the formation of a nationwide network of employees falsely referred to as "medical liaisons" whose actual assigned duties consisted entirely of conventional direct sales activities and which did not include any legitimate scientific activity;

- the illegal direct solicitation of physicians to prescribe Neurontin for off-label uses;

11

- the making of false statements to physicians and pharmacists concerning the efficacy and safety of Neurontin for off-label uses;

- the making of false statements to physicians that there was legitimate scientific evidence supporting the efficacy and safety of Neurontin for off-label uses;

- the payment or offering of gratuities to Pfizer's employees in order to procure their silence; and

- the active training of Pfizer's employees in methods of avoiding detection of their activities by the FDA.

33.     Pursuant to federal regulations, Pfizer's usual sales force was not permitted to promote off-label uses of Neurontin to their physician customers. The FDA, however, permitted drug company representatives to provide balanced, truthful information regarding off-label usage if (1) specifically requested by a physician and (2) if there was no attempt to solicit such information by the drug company.

34.     Beginning in 1995, Pfizer hired additional "medical liaisons" and trained them to aggressively solicit requests for off-label information from physicians. Once this door was open, Pfizer trained these medical liaisons to engage in full-scale aggressive promotion of Neurontin's off-label uses, including repetitive distribution of non-scientific, anecdotal information designed to convince physicians that off-label usage of Neurontin was safe and effective. In effect, Pfizer used the medical liaisons as a surrogate sales force that had liberty to solicit physicians regarding off-label uses. Indeed, medical liaisons were selected and promoted based on their ability to sell.

35.     Pfizer knew their use of these medical liaisons was unlawful, but continued the practice.  In fact, the whistleblower in a federal *qui tam* action, Dr. David Franklin, was

told by Pfizer that the use of medical liaisons was merely a "disguised" way of getting around the FDA rules.

36.    For example, on April 16, 1996, at a training session for medical liaisons, Pfizer's in-house lawyers stopped the video taping of a medical liaison training session to advise the liaisons that notwithstanding formal policies to the contrary, liaisons could "cold call" on physicians so long as they had executed request forms, *i.e.*, forms that supposedly verified that the physician had initiated the meeting, at the end of the call. The liaisons were informed that the request forms could be filled out by Pfizer's sales representatives instead of the doctors. Company lawyers also informed the liaisons in training that there was no need to present balanced information to the customers and those liaisons should always remember that sales were necessary in order to keep the company profitable. The liaisons were also informed by the lawyers, off camera, that there really was no definition of "solicitation" and that there were methods to induce the physicians to inquire about off-label uses. In effect, once the medical liaison got a meeting with a doctor, there were ways to get the information about off-label uses to the doctor even if the physician had not actually requested off-label information. The lawyers also warned the liaisons that under no circumstances should any information about off-label uses be put in writing.

37.    Medical liaisons were instructed in the clearest possible terms that they were to market and sell Neurontin based on its off-label uses. For example, at a teleconference on May 24, 1996, John Ford, a senior marketing executive for Pfizer directly informed the medical liaisons that in order to market Neurontin effectively, Neurontin had to be marketed for monotherapy, pain, bipolar disorder, and other psychiatric uses, all of which were off-label. Ford conceded that such marketing had to be primarily performed by the medical

13

liaisons, because they were the only ones who could discuss these matters. At another meeting with the medical liaisons, Ford was even more straightforward. He said:

> I want you out there every day selling Neurontin. Look this isn't just me, it's come down from Morris Plains that Neurontin is more profitable...We all know Neurontin's not growing adjunctive therapy, beside that is not where the money is. Pain management, now that's money. Monotherapy, that's money. We don't want to share these patients with everybody, we want them on Neurontin only. We want their whole drug budget, not a quarter, not half, the whole thing....We can't wait for them to ask, we need to get out there and tell them up front...That's where we need to be holding their hand and whispering in their ear, Neurontin for pain, Neurontin for monotherapy, Neurontin for bipolar, Neurontin for everything...I don't want to see a single patient coming off Neurontin until they have been up to at least 4800 mg/day. I don't want to hear that safety crap either, have you tried Neurontin, every one of you should take one just to see there is nothing, it's a great drug.

38.    Medical liaisons were trained with a "pitch" to cold-call physicians who saw the most patients in a given specialty, and sell them on the off-label benefits of Neurontin. A key aspect of this scheme was misrepresentation. The first misrepresentation was usually the status of the medical liaisons as they, with the full approval of Pfizer's marketing officials such as John Ford, Phil Magistro, and John Krukar, were routinely introduced as specialists in the specific drug they were presenting at a particular meeting. Medical liaisons were also encouraged to represent themselves as medical researchers, even though they neither conducted medical research nor analyzed medical research performed by others. It was also not uncommon for medical liaisons to be introduced as physicians, even though they had no such qualifications. Sales personnel were instructed to introduce medical liaisons as scientific employees who were given momentary leave of their academic duties to make an individual appearance.

14

39.    Other aspects of this pitch (labelled the "Neurontin Cold Call Story") included

the following aspects:

- Mention that you are the eyes and ears of Pfizer's research and that you are gathering clinical info;

- Then ask general questions about the nature of the practice;

- Mention Neurontin and its approved uses, but dismiss them as old news;

- Ask leading questions about the number of pain patients that the practice sees;

- Ask a series of questions that determine the practice profile for all of the potential off-label uses;

- Reveal that Pfizer has "a great deal of information about the fantastic response rate of patients on Neurontin in all of these disease states";

- Move into a discussion of the clinical trials that this information is demanding;

- And the "90-95% response rate that we are seeing in more than 80% of patients";

- Present the doctor with any publications that are available and point out that many common drugs for pain treatment are in few if any publications;

- Ask the physician to place some patients on Neurontin and tell them that the medical liaison will stay in touch to help develop any case reports;

- Mention that case reports can be lucrative and can lead to clinical trials;

- Offer to do a presentation and luncheon for the entire practice or a group of his friends that will detail all of the "data" we have;

- Invite the physician to consultant meetings in the future and point out that they pay $250 plus a nice trip or meal in the city; and

- If a sales representative is present they should close the sale by asking that the next patient he sees should be put on Neurontin.

40.    During a training session for medial liaisons, Dr. Franklin first witnessed the

scope of the off-label claims that Pfizer used to market Neurontin. The medical liaisons

15

were provided with new company slides that detailed the method to use to increase the use of Neurontin in several different off-label practice types. The slide show contained a slide that showed the "Anecdotal Uses of Neurontin" including reflex sympathetic dystrophy, peripheral neuropathy, diabetic neuropathy, trigeminal neuralgia, essential tremor, restless leg syndrome, attention deficit disorder, periodic limb movement disorder, migraine, bipolar disorder, Lou Gehrig's Disease, and drug or alcohol withdrawal seizures.

41.    Pfizer's executives explained that "this list was very important to the company but that it makes Neurontin look like snake oil, so preempt the laughter by telling your physicians that, 'I'm embarrassed to show you the next slide because it makes Neurontin look like snake oil, but the fact is, we are seeing extra-ordinary results, in some cases up to 90% response in all of these conditions, that will get their attention.'" Richard Grady, a medical liaison, asked if "we have any money to lace studies without big docs." He was instructed to "use the potential of a study to get in the door, even get protocols, but don't waste too much time and don't say you can get them a study, we don't have much money left." He was then told that "if anyone asks for back-up data say we are pulling it together, then suggest that the doc put some of his patients on Neurontin and we will help him publish case reports that could help place a study in his practice. Everybody wins."

42.    None of the off-label claims made in the slide had been substantiated, let alone approved, by the FDA.

43.    Pfizer also made extensive misrepresentations regarding scientific evidence supporting off-label usage of Neurontin. The following misrepresentations relating to off-label usage of Neurontin were routinely made to numerous physicians with Pfizer's knowledge and consent, and at Pfizer's instruction:

16

- **Bipolar Disorder:** Medical liaisons informed psychiatrists that early results from clinical trials evaluating Neurontin for the treatment of bipolar disorder indicated a ninety percent (90%) response rate when Neurontin was started at 900 mg/day dosage and increased to a dosage of 4800 mg/day. No such results existed. Nor was any type of clinical trial being conducted other than a pilot study. There were no clinical trials or studies indicating that Neurontin was safe or effective up to 4800 mg/day. Pfizer knew that there were no such results, clinical trials or studies. Indeed, Pfizer was in possession at this time of clinical trial evidence which showed that there was no dose response difference between patients who received 600 mg/day, 1200 mg/day and 2400 mg/day. In 1997, Pfizer was aware of clinical evidence demonstrating that Neurontin was not significantly superior to a placebo for the treatment of bipolar disorder. Medical liaisons were trained to, and did, inform psychiatrists that there were no reports of adverse effects for Neurontin when used for psychiatric purposes. Most of the published reports on this topic had been written and commercially sponsored by Pfizer, although this fact was hidden.

- **Peripheral Neuropathy, Diabetic Neuropathy, and Other Pain Syndromes**: Medical liaisons were trained and instructed to report, and did report, that "leaks" from clinical trials demonstrated that Neurontin was highly effective in the treatment of various pain syndromes and that a ninety percent (90%) response rate in the treatment of pain was being reported. No such body of legitimate scientific evidence existed. Nor was there any legitimate pool of data from which a response rate, much less a ninety percent (90%) response rate, could be calculated. Medical liaisons were trained to claim, and did claim, support for these findings as a result of inside information about clinical trials when no such information existed. Pfizer knew that there was no such legitimate scientific evidence. The only support for these claims was anecdotal evidence of no legitimate scientific value. Many of the published case reports had been created and/or sponsored by Pfizer in articles which frequently hid Pfizer's involvement in the creation of the article. Pfizer's payment for the creation of these case reports was also hidden from physicians.

- **Epilepsy Monotherapy**: Medical liaisons were trained and instructed to encourage, and did encourage, neurologists to prescribe Neurontin as the sole medication to treat epilepsy, even though reliable scientific studies only found it safe and effective as adjunctive therapy. Medical liaisons were trained to inform, and did inform, neurologists that substantial, legitimate scientific evidence supported Pfizer's claim that Neurontin was effective as monotherapy. In fact, at this time, Pfizer knew that clinical trials regarding Neurontin's efficacy as a monotherapy were inconclusive. One of Pfizer's clinical trials demonstrated that Neurontin was not an effective monotherapy

17

agent; the vast majority of patients in the study taking Neurontin were unable to continue with Neurontin alone. The same study showed that there was no effective difference between administration of Neurontin at 600, 1200 or 2400 mg. Notwithstanding this data, Pfizer and its medical liaisons continued to claim that physicians should use Neurontin at substantially higher doses than indicated by the labeling. Indeed, although medical liaisons routinely claimed Neurontin to be effective as monotherapy, in 1997 the Food and Drug Administration refused to find Neurontin a safe and effective monotherapy.

- **Reflex Sympathetic Dystrophy ("RSD")**: Medical liaisons informed physicians that extensive legitimate scientific evidence demonstrated the efficacy of Neurontin in the treatment of RSD. The only evidence that existed was anecdotal reports of no legitimate scientific value, as Pfizer knew. Medical liaisons were trained to, and did, refer to case reports, most of which had been created or sponsored by Pfizer, as "studies."

- **Attention Deficit Disorder ("ADD")**: Medical liaisons were instructed to, and did, inform pediatricians that there was legitimate scientific evidence that Neurontin was effective for the treatment of ADD. No data, other than occasional anecdotal evidence of no legitimate scientific value, supported this claim, as Pfizer knew. Nonetheless, the medical liaisons were trained to, and did, tell the pediatricians that large numbers of physicians had success treating ADD with Neurontin, when no such case reports existed.

- **Restless Leg Syndrome ("RLS")**: RLS was another condition where Pfizer's medical liaisons were trained to, and did, tell physicians of a growing body of legitimate scientific data that demonstrated Neurontin's efficacy as a treatment, when no scientific data existed, as Pfizer knew. The only reports were anecdotal, of no legitimate scientific value, most of which had been created and/or sponsored by Pfizer.

- **Trigeminal Neuralgia**: Although medical liaisons represented to physicians that legitimate scientific evidence demonstrated that Neurontin could effectively treat Trigeminal Neuralgia, again no scientific data supported this claim, only occasional anecdotal reports of no legitimate scientific value. Pfizer knew this. No data demonstrated that Neurontin was as effective as currently available painkillers, most of which were much less expensive than Neurontin.

- **Essential Tremor/Periodic Limb Movement Disorder**: Medical liaisons were trained to, and did, tell physicians that there was legitimate scientific evidence that Neurontin was effective in the treatment of these conditions. No data supported such claims with the exception of anecdotal reports of no legitimate scientific value.

18

- **Migraine**: Claims that Neurontin was effective in the treatment of migraine headaches were made by the medical liaisons and were supposedly based on early results from clinical trials. However, no early results of clinical trials existed to support these claims, as Pfizer knew. Once again, any data relating to treatment of migraines was purely anecdotal and of no legitimate scientific value. Most of the case reports were either created or sponsored by Pfizer. In fact, in 1996 Pfizer concealed a clinical study which showed that 900 mg. of Neurontin was not statistically significant for the treatment of migraines as compared to a placebo.

- **Drug and Alcohol Withdrawal Seizures**: Medical liaisons suggested to physicians that Neurontin be used in the treatment of drug and alcohol withdrawals, inferring that there was legitimate scientific evidence supporting Neurontin as an effective treatment for these conditions, when there was no such evidence, as Pfizer knew.

44.    Pfizer intended for physicians to rely on these misrepresentations. These physicians did so rely, and consequently wrote numerous prescriptions for Neurontin for the aforesaid off-label uses. Pfizer's personnel routinely made these misrepresentations as part of company policy. These misrepresentations were made to physicians by Dr. Franklin and other co-employees, including Michael Davies, Joseph McFarland, Phil Magistro, Lisa Kellett, Joseph Dymkowski, Darly Moy, Richard Grady, and Ken Lawler.

45.    Dr. Franklin also reported that Pfizer was guilty of the following conduct:

- Upon order of the company and as a result of training of medical liaisons, Dr. Franklin "deliberately contrived reports to mislead physicians into believing that a body of data existed that demonstrated the effectiveness of Neurontin in the treatment of bipolar disease."

- Dr. Franklin was trained and instructed to actively deceive physicians with contrived data, falsified "leaks" from clinical trials, scientifically flawed reports, or "success stories" that stated that Neurontin was highly effective in the treatment of a variety of pain syndromes. No such body of evidence existed.

- He was instructed to advise physicians that Pfizer has developed a large body of data to support the use of Neurontin as monotherapy. This was an "outright lie" and left patients unknowingly without good seizure control.

19

- Medical liaisons were instructed to, and did, tell physicians that a great deal of legitimate scientific data existed that supported the safe use of Neurontin at levels that exceed 4800 mg/day. However, clinically significant safety data existed for dosing levels at only 1800 mg/day.

- Pfizer provided medical liaisons with slides that stated that Neurontin was effective for the treatment of Attention Deficit Disorders but no legitimate scientific data existed to support that claim.

### D.    **Pfizer's Illegal Payments to Doctors**

46.    Pfizer's "publication strategy" required physicians and the "medical liaisons" to perform the work normally performed by the company's salesmen in order to promote Neurontin. Adoption of this strategy required Pfizer to make tens of thousands of payments to the physicians who would act as a surrogate sales force was as well as practicing physicians who would receive the message. In other words, adoption of the publication strategy required Pfizer to make thousands of payments to physicians for the purpose of having those doctors either recommend the prescription of Neurontin or to order Neurontin, in violation of federal kickback regulations. Pfizer was aware that these regulations were violated routinely. The following describes the various programs Pfizer used to make these payments to physicians:

### 1.    **Consultants' Meetings**

47.    Pfizer used "consultants' meetings" to make illegal payments to physicians to encourage off-label use of Neurontin. Federal rules prohibit "kickbacks" to physicians and medical care providers in exchange for prescribing a particular drug. Pfizer disguised its kickbacks as "consultantships."

48.    Under this guise, Pfizer recruited physicians to dinners or conferences and paid them to hear presentations about off-label uses of Neurontin. Under the fiction that

20

these doctors were acting as consultants, Pfizer sometimes (but not always) had the doctors sign sham consulting agreements. At these meetings, Pfizer would give these doctors lengthy presentations relating to Neurontin, particularly regarding off-label usage. Presentations would be made by Pfizer's employees or physician speakers hired by Pfizer for the purpose of promoting Neurontin, and attendees' questions relating to the administration of Neurontin use would be solicited and answered. These presentations asserted or reasonably inferred that legitimate scientific evidence supported the efficacy and safety of Neurontin for off-label uses, although Pfizer knew no such evidence existed. Pfizer also hired physician speakers to relate positive anecdotal experiences concerning the off-label uses of Neurontin, although Pfizer knew that legitimate scientific evidence directly contradicted many of these anecdotal claims. At some conferences, the sponsoring organization or Pfizer intentionally posed questions to the speakers about off-label use to insure that attendees were exposed to such information.

49.     At some, but not all, "consultants meetings" a few questions would be posed to the consultants regarding Pfizer's marketing of Neurontin or how Pfizer's sales force could provide better service to the doctors. The consultants' meetings, however, were not held, and the consultants were not paid, for the purpose of providing Pfizer with expert, independent advice. Pfizer in many cases did not even record the "advice" provided by its consultants and what advice was collected was never acted upon or reviewed.

50.     Pfizer did, however, routinely analyze whether the consultants' meetings were successful in getting the attendees to change their prescription writing practices. At some meetings, the consultants were directly asked if they would write more Neurontin prescriptions as a result of the meeting. Such a question would have been irrelevant if the

21

actual purpose of the meeting was to receive the consultants' advice. Pfizer also routinely tracked consultants' Neurontin prescription writing practices after these meetings. Using market data purchased from third parties, Pfizer analyzed whether the doctors they had paid had in fact written more Neurontin prescriptions after the meeting. Again, such data was only relevant if the real purpose of the payments was to influence the doctors to order more Neurontin.

51.    A typical consultants' meeting was held in Jupiter Beach, Florida for neurologists from the North East CBU during the weekend of April 19-21, 1996. The "consultants" selected for this meeting were not chosen on the basis of their consulting acumen, but because of their potential to write Neurontin prescriptions. In a memorandum announcing the event to Pfizer's personnel, the "Neurontin Marketing Team" acknowledged that in order to target neurologists with the greatest potential for writing Neurontin prescriptions, sales personnel must select potential attendees from a list of top prescription writers for anti-epileptic drugs in the Northeast; only persons who fell within this desirable demographic were allowed to be invited.

52.    Qualifying physicians were given round-trip airfare to Florida (worth $800.00), two nights accommodations (worth $340.00), free meals and entertainment, ground transportation and a "consultant's fee" of $250.00. Ample time was provided so that Pfizer's "consultants" could enjoy the beach resort. The value of the junket was approximately $2,000.00 per physician.

53.    The Jupiter Beach consultants' meeting included two half-days of presentations by Pfizer relating to Neurontin, including extensive presentations relating to off-label uses. Although technically the presentations were provided by an independent

22

company, Proworx, all aspects of the presentation were designed, monitored, and approved by Pfizer. Pfizer selected the speakers, picked the presentation topics, and previewed the content of the presentations to make sure that they were sufficiently favorable toward the off-label use of Neurontin. Pfizer paid all expenses relating to the consultants' meeting including all payments to the attendees and the presenters, all travel, accommodation, meals and entertainment expenses, all presentation expenses, all expenses and fees incurred by Proworx, and the substantial fees paid to the presenting physicians. Notwithstanding the FDA's prohibition regarding the provision of promotional materials on off-label uses, Pfizer provided written abstracts of the presentations that detailed off-label use of Neurontin to each of its "consultants."

54.    Among the physicians making the misleading presentations specified in Paragraph 46 hereof at the Jupiter Beach consultants meeting were Dr. David Reynolds Longmire and Dr. Bruce Nicholson. Dr. Longmire and Dr. Steven Schacter also made the misleading presentations specified in Paragraph 46 hereof at the May, 1996, consultants meeting in Boston, Massachusetts, set out below, along with other physicians. All of these presentations by Drs. Longmire, Nicholson and Schacter addressed the effectiveness of Neurontin as a treatment for pain. Also at the Jupiter Beach consultants meeting, a Dr. Harden and a Dr. LeRoy made the misleading presentations specified in Paragraph 46 hereof in addressing the effectiveness of Neurontin as monotherapy for epilepsy.

55.    Pfizer made no effort to obtain professional advice at Jupiter Beach from the consultants Pfizer had entertained during the weekend. A follow-up memorandum to Pfizer's marketing officials noted that "the participants were delivered a hard hitting message about Neurontin" and emphasized that the participants were encouraged to use

23

Neurontin at higher doses. More importantly, after the conference Pfizer generated "trending worksheets" listing the doctors who attended the consultants' meeting. These worksheets enabled Pfizer to track Neurontin prescription habits of the attendees before and after the consultants' meetings to determine if these "high writing" prescribers wrote more Neurontin prescriptions after the conference. Persuading these heavy prescribers to order more Neurontin for their patients was, in fact, the sole purpose of the Jupiter Beach meeting.

56.     Pfizer hosted dozens of virtually identical consultants' meetings between late 1995 and 1997, in which the format set out in the preceding paragraphs was followed, and extensive kickbacks were paid by Pfizer to attending physicians. Such consultants' meeting included, but were not limited to the following:

| Topic | Location | Dates |
|---|---|---|
| Mastering Epilepsy | La Costa Resort, CA | July 20-23, 1995 |
| Mastering Epilepsy | Santa Fe, NM | Nov. 16-19, 1995 |
| Neurontin Consultants Conference | Marco Island, FL | February 2-4, 1996 |
| Pediatric Epilepsy | Hutchinson Island, FL | February 9-11, 1996 |
| Mastering Epilepsy | Walt Disney World, FL | February 22-25, 1996 |
| Pediatric Epilepsy | Hutchinson Island, FL | March 8-10, 1996 |
| Mastering Epilepsy | Ritz Carlton, Aspen, CO | April 18-21, 1996 |
| Affective Disorders in Psychiatry | Marco Island, FL | April 20, 1996 |
| Affective Disorder Consultants Conference | Southern Pines, NC | April 27, 1996 |

24

| Neuropathic Pain Conference | Palm Beach, FL | May 11, 1996 |
| Regional Consultants Conference | Ritz Carlton, Boston, MA | May 10-11, 1996 |
| Epilepsy Management Advisors Meeting | Sheraton Grande Torrey Pines, La Jolla, CA | June 21-23, 1996 |
| Epilepsy Management | Rancho Bernardo, CA | June 28-30, 1996 |
| Use of Anti-Convulsants in Psychiatric Disorders | Short Hills, NJ | October 18-19, 1996 |
| Non-epileptic Uses of Neurontin | Longboat Key, FL | Nov. 6, 1996 |
| Neurological Conditions Conference | Ritz Carlton, Atlanta, GA | Sept. 27-28, 1997 |

Other substantially similar "consultants meetings" took place at Charleston, SC, Coconut Grove, FL, Naples, FL, Memphis, TN, Louisville, KY, Washington, D.C., Aspen, CO, and other places. Hundreds, if not thousands, of physicians received kickbacks to attend those events.

57. Not all payments to consultants were made at conferences as elaborate as Jupiter Beach. Many such meetings consisted of expensive dinners at local restaurants. The emphasis on these meetings was also on off-label uses, and $200 "honorariums" were paid to the physicians who did nothing for the payment except show up. At none of the events did the consultants provide legitimate consultation to Pfizer, but at all of the events the consultants were encouraged to increase their Neurontin prescription writing. The "consultants meetings" worked as planned, and many of the "consultants" increased their Neurontin prescription writing for off-label uses.

25

## 2.    Medical Education Seminars

58.    Another format where Pfizer paid kickbacks to physicians to hear off-label promotion of Neurontin were programs billed as Continuing Medical Education seminars ("CME"). These conferences and seminars were set up to appear to qualify for an exception to the FDA's off-label marketing restrictions which permits physicians to learn about off-label uses of pharmaceuticals at independent seminars. Such seminars, however, must be truly independent of the drug companies. The drug companies may make "unrestricted grants" for the purpose of a seminar, but may not be involved in formulating the content of the presentations, picking the speakers, or selecting the attendees. None of these requirements were observed with regard to the CME seminars sponsored by Pfizer for the promotion of off-label uses of Neurontin. While Pfizer retained third-party organizations, such as Proworx, to present the event seminars, it had control of virtually every aspect of these events, and the seminar companies obtained Pfizer's approval for all content presented at the seminars. Pfizer also paid all expenses, including all the seminar companies' fees.

59.    Although the seminar companies acted as the conduit for the payments and gratuities given to the physician attendees, like the Jupiter Beach consultants' meetings, Pfizer controlled every aspect of the CME programs. Pfizer designed and approved the programs; hand-picked the speakers for the seminars; approved the seminar presentations at the seminars; previewed, in most cases, the contents of the seminars prior to delivery; selected the attendees based on their ability and willingness to prescribe high quantities of Neurontin; evaluated the presentations in advance to make sure Pfizer's "message" of off-label Neurontin prescribing was appropriately delivered; black-listed presenters whose

26

presentations were not sufficiently pro-Neurontin; and monitored the prescribing patterns of the physicians who attended these conferences to insure the purpose of the conference – increased writing of off-label Neurontin prescriptions – was achieved. As with the "consultants meetings," these CME presentations asserted or reasonably inferred that legitimate scientific evidence supported the efficacy and safety of Neurontin for off-label uses, when Pfizer knew that was not the case, and sometimes included positive anecdotal experiences relating to the off-label uses of Neurontin, when Pfizer knew that legitimate scientific evidence sometimes contradicted these claims. Follow-up reports to marketing executives for Pfizer highlighted that the attendees received presentations regarding off-label marketing and recommendations for dosages larger than those labeled effective by the FDA. These memoranda also reported to senior executives the pledges made by attendees to order more Neurontin for their patients.

60.    For some seminars, high prescription writing physicians were selected to receive junkets comparable to those Pfizer provided to the attendees of the Jupiter Beach "consultants" meetings. Others were less lavish, but physicians received free tuition, free accommodations, free meals, and cash. Frequently Pfizer's CME seminars were accredited by continuing medical education organizations, which meant that the physicians taking advantage of Pfizer's junkets did not have to pay tuition or spend additional time to fulfill their continuing medical education licensure requirements by attending truly independent medical education programs. These CME programs resulted in the increased writing of off-label Neurontin prescriptions.

61.    CME programs sponsored by Pfizer following this format included, but are not limited to, the following:

27

| Seminar | Location | Date |
|---|---|---|
| Merritt-Putnam Epilepsy Postgraduate Course | unknown | January 19, 1996 |
| Merritt-Putnam Seminar | Chicago, IL | January 26, 1996 |
| New Frontiers in AntiEpileptic Drug Use | California | Sept.-Oct. 1996 |
| Diabetic Neuropathy | Ritz Carlton, Boston, MA | June 22-24, 1997 |
| Merritt-Putnam Symposium | Key Biscayne, FL | September 11 1997 |
| Merritt-Putnam Conference on Monotherapy | Palm Springs, CA | September 9, 1997 |
| Merritt-Putnam Conference on Monotherapy | St. Louis, MO | October 3, 1997 |
| Merritt-Putnam Symposium | Boston, MA | December 5, 1997 |

### 3.    Grants and "Studies"

62.    Pfizer also made outright payments, in the form of grants, to reward demonstrated Neurontin advocates.  Pfizer's sales managers identified key doctors who actively prescribed Neurontin or programs which were willing to host Neurontin speakers and encouraged such persons or programs to obtain "educational grants" from Pfizer. Under this program of kickbacks Pfizer paid:

- $2,000.00 to Berge Ninmpolan, MD, "a great Neurontin believer," to attend a neurology seminar in San Francisco, in March 1996;
- $1,000.00 to the University of Texas at Houston, Department of Neurology to host a symposium where presentations would be made regarding successful off-label treatment with Neurontin;

- $3,000.00 to the University of Texas Medical School to host a conference in August 1996 at which a well known specialist in epilepsy, who prescribed Neurontin, would attend;

28

- $4,000.00 to pay for a neurologist from the University of Texas at San Antonio to attend the American Epilepsy Society Conference in December 1996, a conference at which Pfizer was presenting extensive documentation on off-label uses for Neurontin;

- $2,500.00 to the University of Texas at Houston to bring Dr. B.J. Wilder to the campus to hold a seminar. Dr. Wilder was one of Neurontin's biggest boosters for off-label indications and had been paid tens of thousands of dollars to promote Neurontin's off-label uses for Pfizer across the country;

- $2,500.00 in June 1996 to pay for representatives from the University of Pennsylvania Medical Center to attend a conference in Saint Petersberg, Russia on the utilization of anti-epileptic drugs, including Neurontin;

- $5,000.00 to Dr. Alan B. Ettinger, of Stony Brook, NY in December 1996, a physician who had informed Pfizer that he was interested in possibly doing research in Neurontin and maintained a database of patients who were treated with Neurontin;

- $500.00 to Bruce Ehrenberg, of Boston, MA, a leading speaker for Pfizer regarding off-label uses of Neurontin, to attend a conference in China;

- $1,000.00 to Israel Abrams, M.D., Paul C. Marshall, M.D., Beth Rosten, M.D. and Spencer G. Weig, M.D., of Worcester, MA, for educational programs in February 1996. According to the local Pfizer representative requesting the grant, "much of the Neurontin success in Worcester has been attributed to...the 4 pediepileptologists below.";

- $1,400.00 to Dr. Ahmad Beydoun of Ann Arbor, MI for post-graduate training in March 1996. This grant was processed on a quick turnaround, Pfizer's representative noting "I realize that this is a very short time line; however, Dr. Beydoun is a very important customer.";

- $1,500.00 to Jim McAuley, Ph.D. for educational materials relating to epilepsy. Pfizer decided to provide the funds because McAuley was an advocate of Neurontin and he was important in getting another Pfizer's drug, Cerebyx, accepted on the formulary for Ohio State University; and

- A grant in an unknown amount to University Hospital in Cleveland in exchange for the hosting programs regarding Neurontin's use in treating neuropathic pain at conferences specifically devoted to obtaining referrals from other doctors.

29

63.    These grants, and others, were charged to the Neurontin marketing budget. Each of these grants was made solely because an individual who would receive the money was a large Neurontin supporter or would host a program where a well-known Neurontin supporter would recommend that other physicians increase their prescriptions of Neurontin. Each of these grant awards constituted a reward or kickback for the recipient's advocacy of Neurontin.

64.    Pfizer's medical liaisons informed leading Neurontin subscribers that significant advocacy for Neurontin via articles and "studies" would result in the payment of large grants. These studies did not involve significant work for the physicians. Often they required little more than collating and writing up office notes or records. Indeed, as noted below, Pfizer frequently hired technical writers to write the articles for which the "authors" had been given grants.

65.    Pfizer was aware that these articles and studies provided no legitimate scientific benefit. In a letter to the FDA in June 1997, Pfizer submitted a list of "studies relating to pain, pain syndromes, and psychiatric disorders" which failed to include any of these numerous studies, funded by Pfizer. Pfizer intentionally neglected to report these "studies" to the FDA and concealed these "studies" from the FDA because it knew the funded "research" had no scientific value and would not be deemed to be studies by the FDA. Payments Pfizer made for these "studies" included, but were not limited, to the following:

| **Funded Project** | **Payee** | **Payment** |
| --- | --- | --- |
| Statistical Analysis of Patients Treated With Neurontin For Pain | Hans Hansen, M.D.; Statesville, NC | $7,000.00 |

30

| | | |
|---|---|---|
| Reduction of Sympathetically Medicated Pain and Sudomotor Function | David R. Longmire, M.D.; Russellville, AL | $7,000.00 |
| Data Entry for Neurontin and Pain Analysis | Travis Jackson, M.D., David Meyer, M.D.; Winston-Salem, NC | unknown |
| Trial of Neurontin for distal symmetric polyneuropathy associated with AIDS | Joseph Weissman, M.D. Atlanta, GA | $20,000.00 |
| Neurontin for neuropathic pain in chronic pain syndromes | Lavern Brett, M.D. Washington, D.C. | $25,000.00 |
| Retrospective chart analysis of Neurontin use with bipolar disorder patients | Ralph S. Rybeck, M.D. | $5,000.00 |
| Retrospective Analysis of Neurontin in the treatment of pain | David R. Longmire, M.D.; Russellville, AL | $2,000.00 |
| Retrospective Analysis of Neurontin in the treatment of chronic pain | Don Schanz, D.O. Traverse City, MI | $8,000.00 |
| Case histories relating to use of Neurontin as an adjuvant analgesic | Elizabeth J. Narcessian, M.D.; W. Orange, NJ | $4,000.00 |

The "studies" promoting the off-label use of Neurontin which were performed by Defendant Longmire were of no legitimate scientific value. Defendant Longmire knew this.

66.     One particularly large study conducted by Pfizer served as yet another engine to financially reward physicians for prescribing Neurontin. In 1995 and 1996, Pfizer conducted an enormous trial known as STEPS. Although STEPS took the form of a research clinical trial, it was, in fact, a marketing ploy designed to induce neurologists to become comfortable prescribing Neurontin at a far higher dose than indicated in the FDA approved labeling. While most clinical studies have a limited number of investigators treating a number of patients qualified for the study, the STEPS protocol called for over

1,200 "investigators" to enroll only a few patients each. The participating physicians were instructed to titrate their patients to higher than labeled dosages of Neurontin to demonstrate that patients could tolerate high dosages of the drug. Rewarding physicians for prescribing high doses of Neurontin was another way to increase Neurontin sales because higher per patient dosages increased the amount of Neurontin sold. Additionally, the STEPS study was also designed to habituate physicians to place non-study patients on Neurontin on doses higher than found effective in the clinical trials monitored by the FDA.

67.    Physicians enrolling in the STEPS study were paid for agreeing to participate in the study and for every patient enrolled. At the conclusion of the study, Pfizer offered each of the 1,200 investigators additional cash for each patient the doctor kept on Neurontin after the study ended. These payments were unquestionably kickbacks, each participating doctor was expressly paid for writing Neurontin prescriptions for their patients. The number of investigators who received such payments are too many for Plaintiffs to list. Additionally, Pfizer has exclusive control of the information regarding who received such payments at the conclusion of the STEPS trial.

### 4.    Payments to "Authors" of Ghost Written Articles

68.    Yet another method of rewarding doctors for their advocacy of Neurontin was to pay them for lending their names to scientific articles which were actually prepared and written by third parties retained by Pfizer. In 1996, Pfizer retained AMM/ADELPHI, Ltd. ("AMM") and Medical Education Systems, Inc., ("MES") to prepare no less than twenty (20) articles for publication in various neurology and psychiatry journals. Most of these articles promoted the off-label usage of Neurontin and were generated so that Pfizer would have

32

completely controlled publications they could distribute pursuant to their "publication strategy." The content of these articles was actually written by non-physician technical writers retained by Pfizer, and Pfizer controlled the content of all the articles. Pfizer paid all expenses in connection with the creation of these publications.

69.     Once Pfizer and the technical writers conceived the articles, Pfizer and its outside firms attempted to find recognized Neurontin prescribers whose names could be used as the authors of these articles. In some cases, drafts of the articles were completed even before an "author" agreed to place his or her name on the article. This even occurred in connection with case histories that purported to describe the "author's" personal treatment of actual patients. The "authors" were paid $1,000.00 to lend their names to these articles, and also were able to claim publication credit on their curriculum vitae.

70.     Pfizer and its outside firms found journals that would publish the articles. Pfizer's role in creating, approving and sponsoring the articles was hidden from the public. While the articles might reference that the author received an honorarium from the outside firm, the articles failed to state that the honorarium was paid with money provided by Pfizer and that Pfizer had approved the content and hired the actual authors. For example, an article created by Medical Education Systems ("MES"), *Gabapentin and Lamotrignine: Novel Treatments for Mood and Anxiety Disorders,* published in CNS Spectrums noted that "an honorarium was received from Medical Education Systems for preparation of this article," but never revealed Pfizer's retention and payment of MES or the fact the MES personnel, while under contract to Pfizer, wrote the article.

71.     Pfizer used these publications as part of their publication strategy by presenting the articles as evidence of independent research conducted by persons with no

33

monetary interest in Neurontin. This impression, of course, was false. Pfizer created the articles to promote off-label uses for Neurontin, purchased the names and reputations of the authors with kickbacks and controlled the content of the articles. As was the case with the "consultants' meetings" and CME programs, these articles asserted or reasonably inferred that legitimate scientific evidence supported the efficacy and safety of Neurontin for off-label uses, when Pfizer knew no such evidence existed, or included positive anecdotal accounts relating to the off-label uses of Neurontin, when Pfizer knew that legitimate scientific evidence contradicted these claims.

### 5.    Speakers' Bureau

72.    Pfizer also founded a Speakers' Bureau, another method to make large and numerous payments to physicians who recommended Neurontin at teleconferences, dinner meetings, consultants meetings, educational seminars, and other events. These speakers repeatedly gave short presentations to other physicians promoting the off-label use of Neurontin for which they were paid anywhere from $250.00 to $3,000.00 per event. Speakers such as Steven Schachter, B.J. Wilder, Ilo Leppik, Gary Mellick, David Reynolds Longmire, Gregory Bergey, Michael Merren, David Treiman, Michael Sperling, Martha Morrell, R. Eugene Ramsay, John Pellock, Ahmad Beydoun, Thomas Browne, John Gates, Jeffrey Gelblum, Dennis Nitz, Robert Knobler and others received tens of thousands of dollars annually in exchange for recommending to fellow physicians in these presentations that Neurontin be prescribed, particularly for off-label uses. Again, these presentations asserted or reasonably inferred that legitimate scientific evidence supported the efficacy and safety of Neurontin for off-label uses, when Pfizer knew no such evidence existed, and/or included positive anecdotal accounts relating to the off-label uses of Neurontin,

34

when Pfizer knew that legitimate scientific evidence contradicted these claims. The payments that these doctors received were far in excess of the fair market value of the work they performed for Pfizer. Speakers who most zealously advocated Neurontin were hired most frequently for speaking events, notwithstanding the fact that many of these events purported to be independent medical education seminars where independent information was supposed to be delivered. The identity of all the doctors in the Speaker's Bureau who received kickbacks through excessive compensation can only be determined after review o the records in the exclusive custody of Pfizer.

73.     Pfizer's marketing personnel, including its medical liaison staff, informed physicians of the lucrative rewards of joining the Neurontin Speaker's Bureau. Physicians were informed that if they prescribed enough Neurontin, they could also be eligible to receive substantial payments for recommending Neurontin to peers at these events dedicated to promoting Neurontin's off-label uses. Pfizer's marketing personnel, however, made it clear that the only way the doctors could receive such cash payments was if they prescribed substantial amounts of Neurontin to their patients, preferably for off-label uses.

74.     Pfizer either knew that the payments described above constituted kickbacks or acted in reckless disregard of federal laws and regulations that prohibit such kickbacks. They also knew that federal safe harbors did not cover the extensive payments they made to doctors. Moreover, Pfizer was aware that their payments did not comply with the AMA's guidelines for payments to physicians.

75.     In 1997, in the wake of an investigation by the FDA, Pfizer conducted a review of their marketing practices in light of existing Federal kickback regulations. As a result of that review, Pfizer determined that none of the programs described above should

35

have been conducted in the manner previously conducted by Pfizer. Pfizer issued guidelines to comply with the Federal regulations which essentially prohibited each of the programs described above. Nonetheless, the payments to physicians for the off-label marketing of Neurontin did not cease. Pfizer's payments of inappropriate kickbacks to doctors continued through 1998, and on information and belief, up to the guilty plea in May, 2004.

76.   As a direct and proximate result of Pfizer's and Longmire's misrepresentations regarding off-label uses of Neurontin, as previously set out herein, physicians relied upon those misrepresentations and vastly increased their writing of Neurontin prescriptions for off-label uses, as specified in Paragraph Four hereof.

77.   Pfizer and David Reynolds Longmire intended that the misrepresentations regarding off-label uses of Neurontin, previously set out herein, would reach and influence third-party medical-benefit payors, including Plaintiffs, and expected third-party medical-benefit payors, including Plaintiffs, to be influenced by these misrepresentations and pay for Neurontin prescribed for off-label uses, because most of Pfizer's potential profit from off-label prescriptions would be obtained from third-party medical-benefit payors. Said misrepresentations did in fact reach and influence third-party medical-benefit payors, including Plaintiffs, as intended and expected by Pfizer and David Reynolds Longmire.

78.   Further information regarding the misrepresentations previously specified herein, including the identity of speakers, the content of statements, the locations of statements, and the dates of statements, is exclusively within the control of Pfizer.

36

## WARNER-LAMBERT'S PLEA OF GUILTY OF CRIMINAL VIOLATIONS OF THE FOOD DRUG AND COSMETIC ACT

79.    On May 13, 2004, Warner-Lambert was charged with criminal violations of the federal Food Drug and Cosmetic Act in an information brought by the Department of Justice in the United States District Court for the District of Massachusetts.

80.    The information presented criminal charges against Warner-Lambert for violations of 21 U.S.C. 331(a) and (d), 333(a)(2), 352(f)(1) and 355(a) based upon the misconduct set forth above.

81.    The information charged that Warner-Lambert violated 21 U.S.C. 331(a) and (d) by introducing and distributing Neurontin into interstate commerce for uses other than its approved uses and by introducing and delivering Neurontin into interstate commerce in violation of 21 U.S.C. 355, which required Warner-Lambert to obtain FDA approval for all of the proposed intended uses of Neurontin.

82.    The information further charged that Warner-Lambert violated 21 U.S.C. 352(f)(1) by misbranding Neurontin without adequate directions in its label for its proper use.

83.    The information further charged that Warner-Lambert violated 21 U.S.C 355(a) by introducing and delivering Neurontin into interstate commerce without applying for and obtaining FDA approval for Neurontin's proposed and intended uses.

84.    Warner-Lambert entered a plea of guilty to all of the above-referenced criminal charges immediately upon the filing of such charges.

37

## COUNT ONE

### UNJUST ENRICHMENT

Plaintiffs allege as follows against Defendant Pfizer:

85.    Plaintiffs incorporate the allegations contained in the preceding paragraphs.

86.    As a direct and proximate result of its illegal activities, Pfizer has knowingly received, and continues to receive, a substantial profit at the expense of Plaintiffs.

87.    As a direct and proximate result of Pfizer's wrongful acts and omissions as set forth herein, Pfizer holds money which in equity and good conscience belongs to Plaintiffs.  Plaintiffs are entitled to restitution of said monies and disgorgement of Pfizer's profits.

WHEREFORE, Plaintiffs demand judgment against Pfizer for monetary damages and disgorgement, in a sum in excess of the jurisdictional amount, plus the costs of this action.

## COUNT TWO

### NEGLIGENCE

Plaintiffs allege as follows against Defendants Pfizer and David Reynolds Longmire, jointly and individually:

88.    Plaintiffs incorporate the allegations contained in the preceding paragraphs.

89.    Pfizer has a duty to exercise the necessary degree of care expected and required of manufacturers of pharmaceuticals.  Pfizer owed a duty to the public and to third-party medical-benefit payors, including Plaintiffs, to exercise reasonable care in promoting off-label uses for Neurontin.  It was foreseeable to Pfizer that if it breached this duty, third-

38

party medical-benefit payors, including Plaintiffs, would suffer financial damage from paying for Neurontin for off-label uses when they would not otherwise have done so. Pfizer breached this duty by not exercising reasonable care in promoting off-label uses for Neurontin.

90.     Longmire has a duty to exercise the necessary degree of care expected and required of physicians who give presentations to other physicians, and who author or lend their names to articles and studies, promoting the use of pharmaceuticals. Longmire owed a duty to the public and to third-party medical-benefit payors, including Plaintiffs, to exercise reasonable care in promoting off-label uses for Neurontin. It was foreseeable to Longmire that if he breached this duty, third-party medical-benefit payors, including Plaintiffs, would suffer financial damage from paying for Neurontin for off-label uses when they would not otherwise have done so. Longmire breached this duty by not exercising reasonable care in promoting off-label uses for Neurontin when he gave presentations to other physicians, and when he authored or lent his name to the articles and studies set out herein.

91.     Specifically, Pfizer and Longmire negligently promoted the off-label uses of Neurontin in one or more of the following ways:

> (a)     by promoting Neurontin for off-label uses which are not medically accepted;
>
> (b)     by mischaracterizing the pharmacology of Neurontin;
>
> (c)     by promoting Neurontin for off-label uses when there was no legitimate scientific evidence to support the effectiveness of Neurontin for such uses;

(d)     by representing that there was legitimate scientific evidence supporting the efficacy and safety of Neurontin for off-label uses, when no such evidence existed;

(e)     by failing to disclose legitimate scientific evidence that directly contradicted promotional representations that Neurontin was effective and safe for off-label uses; and

(f)     by making false statements as to the efficacy and safety of Neurontin for off-label uses.

92.     As a proximate result of Pfizer's and Longmire's aforesaid combined and concurring negligence, Plaintiffs paid for Neurontin prescribed for off-label uses and were financially damaged thereby.

WHEREFORE, Plaintiffs demand judgment against Pfizer and Longmire, jointly and individually, for compensatory damages in a sum in excess of the jurisdictional amount, plus the costs of this action.

## COUNT THREE

### WANTONNESS

Plaintiffs allege as follows against Defendants Pfizer and David Reynolds Longmire, jointly and individually:

93.     Plaintiffs incorporate the allegations contained in the preceding paragraphs.

94.     In executing its pervasive marketing scheme to promote Neurontin for off-label uses, Pfizer acted in reckless disregard for the rights of third-party medical-benefit payors, including Plaintiffs. Pfizer knew that financial harm to third-party medical-benefit

40

payors, including Plaintiffs, would likely or probably result from its promotion of off-label uses for Neurontin, in that third-party medical-benefit payors, including Plaintiffs, would pay for Neurontin prescribed for off-label uses when they would not otherwise have done so.

95.    In giving presentations to other physicians, and in authoring or lending his name to articles and studies, promoting the off-label uses of Neurontin, Longmire acted in reckless disregard for the rights of third-party medical-benefit payors, including Plaintiffs. Longmire knew that financial harm to third-party medical-benefit payors, including Plaintiffs, would likely or probably result from his promotion of off-label uses for Neurontin, in that third-party medical-benefit payors, including Plaintiffs, would pay for Neurontin prescribed for off-label uses when they would not otherwise have done so.

96.    Specifically, Pfizer and Longmire wantonly promoted the off-label uses of Neurontin in one or more of the following ways:

> (a)    by promoting Neurontin for off-label uses which are not medically accepted;

> (b)    by mischaracterizing the pharmacology of Neurontin;

> (c)    by promoting Neurontin for off-label uses when there was no legitimate scientific evidence to support the effectiveness of Neurontin for such uses;

> (d)    by representing that there was legitimate scientific evidence supporting the efficacy and safety of Neurontin for off-label uses, when no such evidence existed;

41

(e)    by failing to disclose legitimate scientific evidence that directly contradicted promotional representations that Neurontin was effective and safe for off-label uses; and

(f)    by making false statements as to the efficacy and safety of Neurontin for off-label uses.

97.    As a proximate result of Pfizer's and Longmire's aforesaid combined and concurring wantonness, Plaintiffs paid for Neurontin prescribed for off-label uses and were financially damaged thereby.

WHEREFORE, Plaintiffs demand judgment against Pfizer and Longmire, jointly and individually, for compensatory and punitive damages in a sum in excess of the jurisdictional amount, plus the costs of this action.

## COUNT FOUR

## INTENTIONAL FRAUD

Plaintiffs allege as follows against Defendant Pfizer and David Reynolds Longmire, jointly and individually:

98.    Plaintiffs incorporate the allegations contained in the preceding paragraphs.

99.    Pfizer knew there was no legitimate scientific evidence that Neurontin was effective for the above-described off-label uses, yet marketed the drug by representing that there was legitimate scientific evidence that the drug was effective for those uses, with the intent that doctors, the public and third-party medical-benefit payors, including Plaintiffs, would rely on its material misrepresentations in prescribing, purchasing and paying for the drug. Doctors, the public and third-party medical-benefit payors, including Plaintiffs, reasonably relied on the misrepresentations of Pfizer and could not have reasonably known

42

of their falsity until Pfizer pled guilty to criminal conduct as aforesaid. Plaintiffs would not have paid for Neurontin prescribed for off-label uses had they known there was no legitimate scientific evidence that Neurontin was effective for those uses.

100.    Longmire knew there was no legitimate scientific evidence that Neurontin was effective for the above-described off-label uses, yet he represented that there was legitimate scientific evidence that the drug was effective for those uses, with the intent that other doctors, the public and third-party medical-benefit payors, including Plaintiffs, would rely on his material misrepresentations in prescribing, purchasing and paying for the drug. Plaintiffs reasonably relied on the misrepresentations of Longmire and could not have reasonably known of their falsity until Pfizer pled guilty to criminal conduct as aforesaid. Plaintiffs would not have paid for Neurontin prescribed for off-label uses had they known there was no legitimate scientific evidence that Neurontin was effective for the above-described off-label uses.

101.    Plaintiffs believed Pfizer's and Longmire's representations and in reliance thereon paid for Neurontin prescribed for off-label uses. As a result of Pfizer's and Longmire's intentional fraud, Plaintiffs have been financially damaged. These damages are the actual and proximate result of Pfizer's intentional fraud.

WHEREFORE, Plaintiffs demand judgment against Pfizer and Longmire, jointly and individually, for compensatory and punitive damages in a sum in excess of the jurisdictional amount, plus the costs of this action.

43

## COUNT FIVE

### RECKLESS FRAUD

Plaintiffs allege as follows against Defendants Pfizer and David Reynolds Longmire, jointly and individually:

102.    Plaintiffs incorporate the allegations contained in the preceding paragraphs.

103.    Pfizer, without knowledge of the true facts, recklessly represented to doctors, the public and third-party medical-benefit payors, including Plaintiffs, that there was legitimate scientific evidence that Neurontin was effective for the above-described off-label uses, and Pfizer marketed the drug for those uses with the intent that doctors, the public and third-party medical-benefit payors, including Plaintiffs, would rely on its representations in prescribing, purchasing and paying for the drug. Pfizer's said representations were false. Doctors, the public and third-party medical-benefit payors, including Plaintiffs, reasonably relied on the misrepresentations of Pfizer, and could not have reasonably known of their falsity until Pfizer pled guilty to criminal conduct.  Plaintiffs would not have paid for Neurontin prescribed for off-label uses had they known there was no legitimate scientific evidence that Neurontin was effective for those uses.

104.    Longmire, without knowledge of the true facts, recklessly represented to other doctors, the public and third-party medical-benefit payors, including Plaintiffs, that there was legitimate scientific evidence that Neurontin was effective for the above described off-label uses, and Longmire promoted the drug for those uses with the intent that other doctors, the public and third-party medical-benefit payors, including Plaintiffs, would rely on his representations in prescribing, purchasing and paying for the drug. Longmire's said representations were false. Doctors, the public and third-party medical-benefit payors,

44

including Plaintiffs, reasonably relied on the misrepresentations of Longmire, and could not have reasonably known of their falsity until Pfizer pled guilty to criminal conduct. Plaintiffs would not have paid for Neurontin prescribed for off-label uses had they known there was no scientific evidence that Neurontin was effective for those uses.

105.    Plaintiffs believed Pfizer's and Longmire's representations and in reliance thereon paid for Neurontin prescribed for off-label uses. As a result of Pfizer's and Longmire's reckless fraud, Plaintiffs have been financially damaged. These damages are the actual and proximate result of Pfizer's and Longmire's reckless fraud.

WHEREFORE, Plaintiffs demand judgment against Pfizer and Longmire, jointly and individually, for compensatory and punitive damages in a sum in excess of the jurisdictional amount, plus the costs of this action.

## COUNT SIX

## NEGLIGENT OR INNOCENT MISREPRESENTATION

Plaintiffs allege as follows against Defendants Pfizer and David Reynolds Longmire, jointly and individually:

106.    Plaintiffs incorporate the allegations contained in the preceding paragraphs.

107.    In the alternative, Pfizer negligently, or innocently without knowledge of the true facts and by mistake, represented to doctors, the public and third-party medical-benefit payors, including Plaintiffs, that there was legitimate scientific evidence that Neurontin was effective for the above-described off-label uses, and Pfizer marketed the drug for those uses with the intent that doctors, the public and third-party medical-benefit payors, including Plaintiffs, would rely on its representations in prescribing, purchasing and paying for the drug. Pfizer's said representations were false. Doctors, the public and third-party medical-

45

benefit payors, including Plaintiffs, reasonably relied on the misrepresentations of Pfizer, and could not have reasonably known of their falsity until Pfizer pled guilty to criminal conduct. Plaintiffs would not have paid for Neurontin prescribed for off-label uses had they known there was no legitimate scientific evidence that Neurontin was effective for those uses.

108.    In the alternative, Longmire negligently, or innocently without knowledge of the true facts and by mistake, represented to other doctors, the public and third-party medical-benefit payors, including Plaintiffs, that there was legitimate scientific evidence that Neurontin was effective for the above described off-label uses, and Longmire promoted the drug for those uses with the intent that other doctors, the public and third-party medical-benefit payors, including Plaintiffs, would rely on his representations in prescribing, purchasing and paying for the drug. Longmire's said representations were false. Doctors, the public and third-party medical-benefit payors, including Plaintiffs, reasonably relied on the misrepresentations of Longmire, and could not have reasonably known of their falsity until Pfizer pled guilty to criminal conduct. Plaintiffs would not have paid for Neurontin prescribed for off-label uses had they known there was no legitimate scientific evidence that Neurontin was effective for those uses.

109.    Plaintiffs believed Pfizer's and Longmire's representations and in reliance thereon paid for Neurontin prescribed for off-label uses. As a result of Pfizer's and Longmire's negligent or innocent misrepresentations, Plaintiffs have been financially damaged. These damages are the actual and proximate result of Pfizer's and Longmire's misrepresentations.

46

WHEREFORE, Plaintiffs demand judgment against Pfizer and Longmire, jointly and individually, for compensatory damages in a sum in excess of the jurisdictional amount, plus the costs of this action.

## COUNT SEVEN

### SUPPRESSION

Plaintiffs allege as follows against Defendants Pfizer and David Reynolds Longmire, jointly and individually:

110.   Plaintiffs incorporate the allegations contained in the preceding paragraphs.

111.   Pfizer knew there was no legitimate scientific evidence that Neurontin was effective for the above-described off-label uses. Pfizer also knew there was legitimate scientific evidence that directly contradicted many of its promotional representations that Neurontin was effective for off-label uses. Pfizer further knew that the aforesaid representations by physicians promoting Neurontin as effective for off-label uses did not constitute independent medical judgment, because of Pfizer's payments of money and furnishing of gratuities to the physicians, and because of Pfizer's control over the contents of said representations, all as fully alleged previously herein. When Pfizer marketed Neurontin, (1) it failed to disclose that there was no legitimate scientific evidence that Neurontin was effective for said off-label uses; (2) it failed to disclose that there was legitimate scientific evidence which directly contradicted its promotional representations that Neurontin was effective for off-label uses; and (3) it failed to disclose that the aforesaid representations by physicians promoting Neurontin as effective for off-label uses did not constitute independent medical judgment, for the reasons aforesaid.

47

112.    The lack of legitimate scientific evidence that Neurontin was effective for off-label uses was a material fact.  The existence of legitimate scientific evidence directly contradicting promotional representations that Neurontin was effective for off-label uses was also a material fact.  The fact that the aforesaid representations by physicians promoting Neurontin as effective for off-label uses did not constitute independent medical judgment, for the reasons specified above, was also a material fact.

113.    Pfizer had a duty to disclose (1) that there was no legitimate scientific evidence that Neurontin was effective for said off-label uses; (2) that there was legitimate scientific evidence directly contradicting its promotional representations that Neurontin was effective for off-label uses; and (3) that the aforesaid representations by physicians promoting Neurontin as effective for off-label uses did not constitute independent medical judgment, for the reasons specified above.  Because Pfizer marketed Neurontin as efficacious for off-label uses, it had a duty to speak the complete truth as to off-label uses for Neurontin.

114.    Doctors, the public and third-party medical-benefit payors, including Plaintiffs, reasonably relied on Pfizer's omissions and could not have reasonably known of the omitted facts until Pfizer pled guilty to criminal conduct as aforesaid.  Plaintiffs would not have paid for Neurontin prescribed for off-label uses had they known (1) there was no legitimate scientific evidence that Neurontin was effective for those uses; (2) there was legitimate scientific evidence directly contradicting Pfizer's representations that Neurontin was effective for off-label uses; and (3) the aforesaid representations by physicians promoting Neurontin as effective for off-label uses did not constitute independent medical judgment, for the reasons specified above.

48

115.    Longmire knew there was no legitimate scientific evidence that Neurontin was effective for the above-described off-label uses. Longmire also knew there was legitimate scientific evidence directly contradicting his and Pfizer's promotional representations that Neurontin was effective for off-label uses. Longmire further knew that his representations promoting Neurontin as effective for off-label uses did not constitute independent medical judgment, because of Pfizer's payments of money and furnishing of gratuities to him, and because Pfizer controlled the contents of his said representations, all as fully alleged previously herein. When Longmire gave presentations to other physicians, and authored or lent his name to articles and studies, promoting the off-label uses of Neurontin, he failed to disclose (1) that there was no legitimate scientific evidence that Neurontin was effective for said off-label uses; (2) that there was legitimate scientific evidence directly contradicting his and Pfizer's promotional representations that Neurontin was effective for off-label uses; and (3) that his presentations, articles and studies did not constitute independent medical judgment, for the reasons specified above.

116.    Longmire had a duty to disclose (1) that there was no legitimate scientific evidence that Neurontin was effective for said off-label uses; (2) that there was legitimate scientific evidence directly contradicting his and Pfizer's promotional representations that Neurontin was effective for off-label uses; and (3) that his presentations, articles and studies did not constitute independent medical judgment, for the reasons specified above. Because Longmire gave presentations to other physicians, and authored or lent his name to articles and studies, promoting the off-label uses of Neurontin, he had a duty to speak the complete truth as to off-label uses for Neurontin.

49

117.    Doctors, the public and third-party medical-benefit payors, including Plaintiffs, reasonably relied on Longmire's omissions and could not have reasonably known of the omitted facts until Pfizer pled guilty to criminal conduct as aforesaid. Plaintiffs would not have paid for Neurontin prescribed for off-label uses had they known (1) there was no legitimate scientific evidence that Neurontin was effective for those uses; (2) there was legitimate scientific evidence directly contradicting Pfizer's and Longmire's promotional representations that Neurontin was effective for off-label uses; and (3) Longmire's presentations, articles and studies did not constitute independent medical judgment, for the reasons specified above.

118.    Plaintiffs believed Pfizer's and Longmire's representations, and in reliance on Pfizer's and Longmire's omissions, paid for Neurontin prescribed for off-label uses. As a result of Pfizer's and Longmire's suppression of material facts, Plaintiffs have been financially damaged. These damages are the actual and proximate result of Pfizer's and Longmire's suppression of material facts.

WHEREFORE, Plaintiffs demand judgment against Pfizer and Longmire, jointly and individually, for compensatory and punitive damages, in a sum in excess of the jurisdictional amount, plus the costs of this action.

## COUNT EIGHT

## CONCEALMENT/DECEPTION

Plaintiffs allege as follows against Defendant Pfizer:

119.    Plaintiffs incorporate the allegations contained in the preceding paragraphs.

120.    Pfizer knew there was no legitimate scientific evidence that Neurontin was effective for the above-described off-label uses. Pfizer also knew there was legitimate

50

scientific evidence that directly contradicted many of its promotional representations that Neurontin was effective for off-label uses. Pfizer affirmatively concealed these material facts as previously described herein, including but not limited to, by making monetary payments to physicians as a reward for advocating the off-label uses of Neurontin and then allowing those physicians' advocacy of such off-label uses to appear to be independent medical judgment.

121.    These affirmative acts of concealment were undertaken in such a manner as to deceive and mislead, and were undertaken willfully with the intent to induce doctors, the public, and third-party medical-benefit payors, including Plaintiffs, to alter their position to their injury.

122.    Doctors, the public and third-party medical-benefit payors, including Plaintiffs, reasonably relied on Pfizer's concealment of material facts and could not have reasonably known of the concealed facts until Pfizer pled guilty to criminal conduct as aforesaid. Plaintiffs would not have paid for Neurontin prescribed for off-label uses had they known (1) there was no legitimate scientific evidence that Neurontin was effective for those uses, and (2) there was legitimate scientific evidence directly contradicting Pfizer's promotional representations that Neurontin was effective for off-label uses.

123.    Plaintiffs, in reliance on Pfizer's concealment of material facts, paid for Neurontin prescribed for off-label uses. As a result of Pfizer's concealment of material facts, Plaintiffs have been financially damaged. These damages are the actual and proximate result of Pfizer's concealment of material facts.

WHEREFORE, Plaintiffs demand judgment against Pfizer, for compensatory and punitive damages, in a sum in excess of the jurisdictional amount, plus the costs of this action.

## COUNT NINE

### CONSPIRACY TO DEFRAUD

Plaintiffs allege as follows against Defendants Pfizer and David Reynolds Longmire, jointly and individually:

124.    Plaintiffs incorporate the allegations contained in the preceding paragraphs.

125.    Pfizer and Longmire combined, conspired, and agreed together to intentionally or wantonly defraud the public, doctors and third-party medical-benefit payors, including Plaintiffs, in their marketing and promotion of Neurontin for off-label uses.

126.    The objects of the conspiracy were to induce doctors to prescribe Neurontin for off-label uses, to induce the public to purchase Neurontin prescribed for off-label uses, and to induce third-party medical-benefit payors, including Plaintiffs, to pay for Neurontin prescribed for off-label uses, through the following means: Pfizer and Longmire would represent to doctors, the public, and third-party medical-benefit payors, including Plaintiffs, that there was legitimate scientific evidence that Neurontin was effective for the above-described off-label uses, with the intent that doctors, the public, and third-party medical-benefit payors, including Plaintiffs, would rely on said representations, when Pfizer and Longmire knew the representations were false.

127.    Alternatively, the objects of the conspiracy were to induce doctors to prescribe Neurontin for off-label uses, to induce the public to purchase Neurontin prescribed for off-label uses, and to induce third-party medical-benefit payors, including

52

Plaintiffs, to pay for Neurontin prescribed for off-label uses, through the following means: Pfizer and Longmire would represent to doctors, the public, and third-party medical-benefit payors, including Plaintiffs, that there was legitimate scientific evidence that Neurontin was effective for off-label uses, with the intent that doctors, the public, and third-party medical-benefit payors, including Plaintiffs, would rely on said representations, when Pfizer and Longmire knew the representations were likely or probably false.

128.    Alternatively, the objects of the conspiracy were to induce doctors to prescribe Neurontin for off-label uses, to induce the public to purchase Neurontin prescribed for off-label uses, and to induce third-party medical-benefit payors, including Plaintiffs, to pay for Neurontin prescribed for off-label uses, through the following means: Pfizer and Longmire would promote Neurontin for off-label uses to doctors, the public, and third-party medical-benefit payors, including Plaintiffs, (1) with knowledge that there was no legitimate scientific evidence that Neurontin was effective for off-label uses; (2) with knowledge that there was legitimate scientific evidence directly contradicting their promotional representations that Neurontin was effective for off-label uses; and (3) with knowledge that the aforesaid representations by physicians, including Longmire, promoting Neurontin as effective for off-label uses did not constitute independent medical judgment, because of Pfizer's payments of money and furnishing of gratuities to the physicians, including Longmire, and because of Pfizer's control over the contents of said representations, all as fully alleged previously herein. It was further a means of the conspiracy that Pfizer and Longmire would intentionally fail to disclose in their promotions (1) that there was no legitimate scientific evidence that Neurontin was effective for off-label uses; (2) that there was legitimate scientific evidence directly contradicting their promotional

53

representations that Neurontin was effective for off-label uses; and (3) that the aforesaid representations by physicians, including Longmire, promoting Neurontin as effective for off-label uses did not constitute independent medical judgment, for the reasons specified above.

129.    Pfizer and Longmire had actual knowledge of, and the intent to bring about, the objects of the conspiracy.

130.    Pfizer and Longmire acted in order that Plaintiffs should suffer damage.

131.    In knowing and intentional furtherance of the conspiracy, Pfizer committed the various acts previously described herein.

132.    In knowing and intentional furtherance of the conspiracy, Longmire authored, or lent his name to, the articles and "studies" previously described herein, which falsely represented that there was legitimate scientific evidence that Neurontin was effective for off-label uses; or which failed to disclose that there was no legitimate scientific evidence that Neurontin was effective for off-label uses; or which failed to disclose that there was legitimate scientific evidence directly contradicting his promotional representations that Neurontin was effective for off-label uses; or which failed to disclose that his articles and studies promoting Neurontin as effective for off-label uses did not constitute independent medical judgment, for the reasons specified above.

133.    In knowing and intentional furtherance of the conspiracy, Longmire acted as a speaker as previously described herein, giving presentations to physicians which falsely represented that there was legitimate scientific evidence that Neurontin was effective for off-label uses; or which failed to disclose that there was no legitimate scientific evidence that Neurontin was effective for off-label uses; or which failed to disclose that there was

legitimate scientific evidence directly contradicting his promotional representations that Neurontin was effective for off-label uses; or which failed to disclose that his presentations promoting Neurontin as effective for off-label uses did not constitute independent medical judgment, for the reasons specified above.

134.    The conspiracy succeeded, as previously set out herein, thereby creating an actionable wrong.  Plaintiffs were defrauded and caused to pay substantial monies for Neurontin prescribed to their employees for off-label uses.

135.    A conspiratorial agreement need not be explicit; a tacit agreement is sufficient.  U. S. v. Turner, 400 F.3d 491, 496 (7th Cir. 2005).  A conspiracy can be established through circumstantial evidence. U.S. v. Pineiro, 389 F.3d 1359, 1368 (11th Cir. 2005). The conspiracy here is demonstrated by the circumstantial evidence set out herein.

136.    Longmire is civilly liable for the acts of Pfizer committed in furtherance of the conspiracy, and for the successful common objects of the conspiracy.

WHEREFORE, Plaintiffs demand judgment against Pfizer and Longmire, jointly and individually, for compensatory and punitive damages in a sum in excess of the jurisdictional amount, plus the costs of this action.

### FRAUDULENT CONCEALMENT/ EQUITABLE TOLLING OF STATUTE OF LIMITATIONS

137.    Plaintiffs incorporate the allegations contained in the preceding paragraphs.

138.    Any applicable statutes of limitation have been tolled by Pfizer's and Longmire's affirmative acts of deliberate and fraudulent concealment as aforesaid. Through such acts, Pfizer and Longmire have been able to conceal from Plaintiffs the truth

about their wrongful conduct involving Neurontin, as alleged herein, thereby tolling the running of the applicable statutes of limitation.

139.    Plaintiffs did not discover, and could not reasonably have discovered, Pfizer's and Longmire's wrongful conduct as alleged herein, in the exercise of due diligence, until Pfizer pled guilty to criminal conduct.

140.    Pfizer and Longmire are estopped from relying on any statute of limitations defense because of their unfair or deceptive conduct.

141.    Because of the self-concealing nature of Pfizer's and Longmire's actions, and their affirmative acts of concealment, Plaintiffs assert the tolling of any applicable statutes of limitation affecting its claims.

Respectfully submitted,

STEVEN A. MARTINO          (MAR057)
W. LLOYD COPELAND          (COP006)

OF COUNSEL:

**TAYLOR ✦ MARTINO ✦ KUYKENDALL**
Post Office Box 894
Mobile, Alabama 36601-0894
Telephone:  (251) 433-3131
Facsimile:    (251) 433-4207
stevemartino@taylormartino.com
lloyd@taylormartino.com

CHARLES H. DODSON          (DOD006)
JOSEPH D. STEADMAN          (STE084)

OF COUNSEL:

56

**DODSON & STEADMAN, P.C.**
Post Office Box 1908
Mobile, AL. 36633-1908
Telephone:  (251) 690-9300
Facsimile:  (251) 690-9311
chd@dodsonsteadman.com
jds@dodsonsteadman.com

GREGORY C. COOK   (COO038)

OF COUNSEL:

**BALCH & BINGHAM, LLP**
1901 6th Avenue, N.
Suite 2600
Birmingham, AL 35203
Telephone:  (205) 251-8100
Facsimile:  (205) 226-8798
gcook@balch.com

**PLAINTIFFS DEMAND TRIAL BY JURY**

STEVEN A. MARTINO

SERVE DEFENDANTS:

PFIZER, INC.:
**CERTIFIED MAIL - BY SERVICE TO REGISTERED AGENT:**

The Corporation Company
2000 Interstate Park Drive
Suite 204
Montgomery, AL 36109

DAVID REYNOLDS LONGMIRE:
**PERSONAL SERVICE:**

David Reynolds Longmire, M.D.
13150 Highway 43
Russellville, AL 35653

57