# EXHIBIT "B"

ORIGINAL

IN THE CIRCUIT COURT OF FRANKLIN COUNTY, ALABAMA

| | |
|---|---|
| DAVID R. LONGMIRE, M.D. ) | |
| ) | |
| Plaintiff, ) | |
| ) | CIVIL ACTION |
| v. ) | |
| ) | NO.: CV-2006- 120 |
| PFIZER, INC., and ) | (JURY DEMAND) |
| WARNER-LAMBERT COMPANY, a foreign ) | |
| corporation qualified to do business in the State of ) | |
| Alabama ) | |
| 235 East 42nd Street ) | |
| New York, New York, 10017 ) | |
| c/o Its Registered Agent For Service Of Process In The ) | |
| State of Alabama: ) | |
| The Corporation Company ) | |
| 2000 Interstate Park Drive ) | |
| Suite 204 ) | |
| Montgomery, Alabama 36109 ) | |
| ) | |
| Defendant. ) | |

## COMPLAINT

### INTRODUCTION

1. This complaint concerns the fraudulent misrepresentation, concealment, and deceit perpetrated by Defendant Warner-Lambert Company ("Warner-Lambert"), its Parke-Davis division, and Pfizer, Inc. ("Pfizer") on plaintiff Dr. David R. Longmire ("Dr. Longmire"), an Alabama neurologist. The Defendant engaged in a scheme to illegally and fraudulently market an epilepsy drug that was about to lose its profitability unless the Defendant found a way to increase its use for other conditions. The Defendant targeted Dr. Longmire to be an unwitting pawn in this scheme. When the scheme fell apart, Dr. Longmire was left in its wake. Dr. Longmire seeks compensation for the harm caused by the Defendant's willfully fraudulent and deceitful conduct.

Page 1 of 12 Pages

## PARTIES

2. Dr. Longmire is an individual and a resident of Franklin County, Alabama.

3. Pfizer is a Delaware corporation with a principal place of business at 235 East 42nd Street, New York, New York 10017. Pfizer is principally engaged in the manufacture and sale of pharmaceuticals and is one of the largest pharmaceutical companies in the United States. Pfizer is the successor-in-interest to defendant Warner-Lambert Company and its Parke-Davis division.

4. Warner-Lambert was acquired in June 2000 by Pfizer. This acquisition included Warner-Lambert's Parke-Davis division. Prior to the acquisition, Warner-Lambert was a Delaware corporation that maintained its principal place of business at 201 Tabor Road, Morris Plains, New Jersey 07950. In 1993, Warner-Lambert received approval from the United States Food and Drug Administration ("FDA") to market Neurontin in the United States and did so through its Parke-Davis division. After the acquisition, the marketing of Neurontin continued to be managed at the merged-out company's Morris Plains, New Jersey location.

## FACTUAL ALLEGATIONS

### A. Overview of Defendant's Fraudulent Conduct

5. On May 13, 2004, Warner-Lambert, and/or its Parke-Davis division, which were acquired by Pfizer in 2000 (hereinafter referred to singly as "the Defendant"), pleaded guilty to a criminal information filed in the United States District Court for the District of Massachusetts and admitted it criminally violated the Federal Food, Drug and Cosmetic Act, 21 U.S.C. § 331 *et seq.* in connection with its marketing and sales practices for a drug known as Neurontin.

6. The FDA approved Neurontin in 1993 for use only as adjunctive therapy in the treatment for epilepsy.

7. By the fall of 1995, the Defendant recognized that potential future Neurontin sales for epilepsy therapy were limited. The Defendant conducted evaluations that indicated a market potential for certain unapproved uses for Neurontin, commonly known as "off-label" uses. These uses included post-herpetic neuralgia, painful diabetic neuralgia, anxiety disorder, social phobias, and bipolar disorder.

8. In order to avoid the federal statutes and regulations which make it illegal for a manufacturer to promote off-label uses of its product, the Defendant, in violation of federal law, engaged in a number of fraudulent marketing and sales schemes to promote the sale and use of Neurontin for off-label uses.

9. One of the Defendant's fraudulent schemes involved using physicians to promote the off-label use of Neurontin because off-label promotional prohibitions do not apply to physicians, who can treat a medical condition with any prescription drug that would benefit the patient.

10. Part of this fraudulent and deceptive scheme targeted neurologists, including the Plaintiff, to leverage their experience with the use of Neurontin for pain. These neurologists were specifically told that the Defendant intended to apply to the FDA for approval for the expanded use of Neurontin in the treatment of neuropathic pain.

11. The Defendant provided study grants, solicited the targeted physicians to publish articles supporting the expanded use of Neurontin to reduce pain, and, through seemingly independent medical education companies, invited these physicians to speak at so-

called consultants' meetings and educational events. The Defendant represented that it was gathering the studies and articles as part of its effort to obtain clinical data to support an FDA application for approval of Neurontin as a treatment for certain types of neuropathic pain.

12. Unknown to the targeted physicians, including the Plaintiff, the Defendant had little or no intention of actually presenting either the results of the studies or the publications to the FDA. Also unknown to the targeted physicians, including the Plaintiff, the seemingly independent medical education companies were actually hired by the Defendant to further this scheme.

13. The Defendant, however, could not openly, honestly, and without deception and fraud inform the targeted physicians of its plans and methods and/or the Defendant's actual intent to ignore, violate, and circumvent the federal prohibitions in this area. As a result, the Defendant dealt unfairly, deceptively, untruthfully and fraudulently with these physicians, subjecting them to increased legal exposure, claims, and damages. Dr. Longmire is one of the physicians whom the Defendant targeted, exploited and used as set forth below.

### B. Background of David R. Longmire, M.D.

14. Dr. Longmire is a physician licensed to practice in the State of Alabama, specializing in pain evaluation and management, neurological assessment, and clinical neurophysiology. He is a Clinical Associate Professor in the Department of Internal Medicine at the University of Alabama Birmingham-Huntsville Regional Medical Campus, Huntsville, Alabama.

15. Since 1969, Dr. Longmire has had a special interest in the area of clinical and neuro-physiological assessment of various forms of neuropathic pain.

16. From 1991-1994, Dr. Longmire published a number of articles relating to the neurological aspects of pain and the diagnostic evaluation of various forms of neuropathic pain disorders. By the end of 1994 he observed that the intensity and distribution of comorbid pain in several seizure patients appeared to decrease when Neurontin was added to their regular seizure medications, whereas the pain persisted before the introduction of Neurontin.

### C. Solicitation by Defendant Warner-Lambert

17. On or about 1995, the Defendant invited Dr. Longmire to participate in a small meeting of academic and practicing physicians to discuss their individual and collective experience with Neurontin. In addition to speaking about seizures, each speaker related similar observations in patients who experienced a reduction in comorbid pain when given Neurontin. When a medical school faculty member asked one of the Defendant's senior management officials why the Defendant was not developing Neurontin for use in neuropathic pain, the manager explained that such topics could only be answered after all appropriate studies and reports were submitted to the FDA in an application for a new indication for the use of Neurontin.

18. Several months after that meeting, Dr. Longmire received an educational grant from the Defendant to analyze the clinical records of comorbid pain in patients who had been given Neurontin for seizures.

19. Subsequently the results of Dr. Longmire's findings underwent peer review to determine if they met criteria for a poster presentation at the annual meeting of the American Medical EEG Association (now the Association for EEG and Clinical Neuroscience). The findings were accepted and *Clinical Electrocephalography*, a medical journal, published an

abstract.

20. The Defendant provided Dr. Longmire additional developmental grants for actuarial studies on comorbid or neuropathic pain and its response to Neurontin.

21. Because of his experience in pain education and his findings regarding Neurontin, the Defendant, acting through agents, invited Dr. Longmire to speak at various Continuing Medical Education ("CME") meetings of physicians regarding his observations on Neurontin in epilepsy as well as its effect on comorbid or neuropathic pain.

22. The Defendant and/or its agents told Dr. Longmire that the lectures were intended to present early studies of the development of Neurontin for seizures to physicians who were not aware of the indications or methods of using Neurontin, and also told Dr. Longmire that he could speak about off-label uses of Neurontin where appropriate.

23. Dr. Longmire specifically asked the Defendant if his giving such lectures and presentations was legal and ethical, and the Defendant told him that they were legal and ethical because all were CME programs offered by independent medical education companies that followed guidelines set by the Accreditation Council for Continuing Medical Education.

24. Dr. Longmire asked if his participation in small discussion groups, consisting of five to six well-known academic neurologists, epileptologists and pain physicians for the purpose of creating, editing or reviewing educational materials that contained discussion of neuropathic pain was appropriate. The Defendant told Dr. Longmire that it had decided to proceed with multicenter control trials on two types of neuropathic pain to support the Defendant's application for FDA approval for the use of Neurontin to treat neuropathic pain, and that therefore his participation in such discussion groups was appropriate.

25. Relying on the Defendant's statements, in which the Defendant appeared to be following CME guidelines while preparing for, or performing, appropriate control trials necessary for FDA approval, Dr. Longmire engaged in a series of presentations at individual and group meetings, supervised by apparently accredited CME groups, during which he shared his clinical experience and category analysis of patients who had initially been placed on Neurontin for seizures, then for other neurological abnormalities including neuropathic pain.

### D. The Defendant's Illegal, Fraudulent and Deceptive Practices

26. Subsequent to the Defendant's guilty plea regarding its illegal, fraudulent and deceptive practices relating to the marketing of Neurontin, several consolidated complaints against the Defendant have been filed in the United States District Court for the District of Massachusetts on behalf of classes of individuals and third-party payors, which allege that the Defendant created and implemented a fraudulent marketing and sales scheme to boost the sales of Neurontin.

27. Dr. Longmire is specifically named in these complaints as participating in this fraudulent marketing scheme, even though he was ignorant of the Defendant's scheme to illegally promote off-label uses of Neurontin. The complaints identify Dr. Longmire as a speaker at various conferences where he presented information regarding the use of Neurontin as a pain-management drug. Dr. Longmire believed he was handpicked to speak based on his expertise in pain management, not as a delivery-mechanism for a vast and fraudulent marketing scheme. The Defendant failed to disclose to Dr. Longmire that the conference organizers, supposedly independent medical education companies, were actually acting at the behest of the Defendant in order to further the fraudulent marketing scheme. Dr. Longmire

staked his reputation on presenting his clinical observations to his peers and colleagues at independently organized events free of potential conflicts or ethical violations, only to find out later that the Defendant used him as a pawn.

28. The Defendant willfully and knowingly concealed from Dr. Longmire the fact that the invitations it extended asking him to speak at various meetings and conferences were in fact part of a fraudulent scheme to skirt FDA regulations and illegally market Neurontin for off-label uses. Dr. Longmire believed that his efforts were directed toward educating medical professionals on the various uses of Neurontin, but because of the Defendant's deceit, he unwittingly became part of the Defendant's illegal marketing scheme.

29. The Defendant also misrepresented to Dr. Longmire that it was seeking FDA approval for Neurontin as a drug to treat neuropathic pain, whereas in reality the Defendant had no intention of seeking such approval when it could profit from the off-label use of Neurontin by continuing to promote it illegally.

30. If Dr. Longmire had known of the Defendant's illegal marketing scheme, he would not have placed his professional practice and reputation in jeopardy by accepting invitations to speak at meetings, the contents of which the Defendant used as an important element in its illegal marketing scheme.

### E. Harm to Plaintiff

31. As a direct result of the Defendant's fraudulent misrepresentations, concealment and deceit, a certain insurance company and worker compensation fund have threatened to sue Dr. Longmire for his alleged role in the Defendant's fraudulent marketing scheme, forcing him to incur substantial legal costs in preparation for his defense, and exposing him to potential

liability.

32.  As a direct result of the Defendant's fraudulent misrepresentations, concealment, and deceit, Dr. Longmire's name has been included in the multi-district litigation lawsuits, thereby impugning his reputation among his colleagues and peers and calling his integrity into question. Before the filing of such lawsuits, a search of Dr. Longmire's name on the Internet resulted in hyperlinks to his academic work, whereas now the same search results in hyperlinks to complaints filed in the multi-district litigation actions.

## COUNT I
### (Fraudulent Misrepresentation: Ala. Code § 6-5-101)

33.  The Plaintiff repeats and realleges the allegations contained in Paragraphs 1 through 32 as if expressly set forth herein.

34.  By deliberately misrepresenting to Dr. Longmire that the Defendant was seeking FDA approval for certain off-label uses of Neurontin, the Defendant made false representations of material fact to Dr. Longmire.

35.  By deliberately misrepresenting its own role in controlling the content of certain CME meetings at which Dr. Longmire spoke, by misrepresenting the role of such meetings in the Defendant's scheme to illegally market Neurontin, and by assuring Dr. Longmire that his participation in such meetings comported with all ethical guidelines, the Defendant made false representations of material fact to Dr. Longmire.

36.  The Defendant knew that its representations to Dr. Longmire were false when made.

37.  Dr. Longmire justifiably relied on the Defendant's representations in accepting invitations to speak about his clinical experience with Neurontin.

38. The Defendant's conduct deceived Dr. Longmire into believing that he was acting independently of the Defendant, free of any potential ethical violations or conflicts of interest.

39. The Defendant's conduct in misrepresenting to Dr. Longmire its intentions of seeking FDA approval for certain off-label uses of Neurontin and in misrepresenting the independence of certain CME meetings in order to further its illegal marketing scheme was gross, oppressive and malicious.

40. Dr. Longmire has suffered damages as a result of the Defendant's fraudulent conduct.

## COUNT II
### (Suppression of a Material Fact: Ala. Code § 6-5-102)

41. The plaintiff repeats and realleges the allegations contained in Paragraphs 1 through 40 as if expressly set forth herein.

42. The Defendant had a duty to inform Dr. Longmire of its illegal marketing scheme and its role in controlling the content of certain CME meetings to which the Defendant invited Dr. Longmire to speak.

43. The Defendant deliberately concealed such material information when it failed to inform Dr. Longmire of its illegal marketing scheme.

44. The Defendant's conduct in concealing such material information was gross, oppressive and malicious.

45. As a direct result of the Defendant's failure to disclose such information, Dr. Longmire has suffered actual injury.

## COUNT III

Page 10 of 12 Pages

## (Fraudulent Deceit: Ala. Code § 6-5-104)

46. The plaintiff repeats and realleges the allegations contained in Paragraphs 1 through 40 as if expressly set forth herein.

47. In failing to disclose to Dr. Longmire that he was actually a pawn in the Defendant's illegal marketing scheme, that the CME meetings to which he was invited were actually part of the illegal marketing scheme, and that the Defendant never intended to seek FDA approval for certain off-label uses of Neurontin, the Defendant deliberately and knowingly deceived Dr. Longmire in order to use him as a pawn in its illegal marketing scheme.

48. The Defendant asserted that Dr. Longmire's participation in the CME meetings regarding the use of Neurontin for certain off-label uses was ethical and free of any potential conflicts of interest even though the Defendant knew such representations were false when made.

49. The Defendant promised that Dr. Longmire's participation in such meetings was free from any potential legal or ethical violations, even though the Defendant knew that such meetings violated both the law and ethical guidelines.

50. The Defendant's deceitful conduct was gross, oppressive and malicious.

51. As a direct result of the Defendant's willfully fraudulent and deceitful conduct, Dr. Longmire has suffered damages.

**WHEREFORE**, Plaintiff David R. Longmire demands judgment against Defendants Warner-Lambert Company, its Parke-Davis division, and Pfizer, Inc., jointly and severally, as

follows:

    a.    On Counts One, Two and Three, the actual damages suffered by the Plaintiff;

    b.    On Counts One, Two and Three, find that the Defendant's conduct was gross, oppressive and malicious, and award three times the damages the Plaintiff has sustained as a result of Defendant's conduct pursuant to Ala. Code § 6-11-20; and,

    c.    Such other and further relief as may be just and proper under the circumstances.

### JURY DEMAND

The plaintiff demands a trial by jury.

DAVID R. LONGMIRE, M.D.

By his attorney,

_____
Michael L. Weathers (WEA006)
121 W. Alabama St. - Suite 5
Florence, AL 35630-5586
Telephone and Facsimile: (256) 764-1318



Dated: May 12, 2006

# 1429517 v2